Barney QUILTER, et al., Plaintiffs,

v.

George V. VOINOVICH,
et al., Defendants.

No. 5:91 CV 2219.

United States District Court,
N.D. Ohio, E.D.

Jan. 31, 1992.

Timothy F. Scanlon, Scanlon & Gearinger, Akron, Ohio, Armistead W. Gilliam, Jr., Ann Wightman, Faruki, Gilliam & Ireland, Dayton, Ohio, for plaintiffs.

Timothy F. Scanlon, Scanlon & Gearinger, Akron, Ohio, Thomas I. Atkins, Sr., Brooklyn, N.Y., Armistead W. Gilliam, Jr., Ann Wightman, Laura A. Sanom, Faruki, Gilliam & Ireland, Dayton, Ohio, for plaintiff William L. Mallory.

Orla Ellis Collier, III, Norton Victor Goodman, James F. DeLeone, Mark D. Tucker, Benesch, Friedlander, Coplan & Aronoff, Columbus, Ohio, Charles M. Rosenberg, Maynard A. Buck, III, Jeremy Gilman, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio, for defendants.

Before JONES, Circuit Judge, PECK, Senior Circuit Judge, and DOWD, District Judge.

## OPINION AND ORDER

JOHN W. PECK, Senior Circuit Judge.

This three-judge district court was convened to hear Plaintiffs' constitutional and statutory challenges to the 1991 Apportionment Plan for the Ohio General Assembly (the Plan). Plaintiff Barney Quilter, a state representative and designee of the Speaker of the Ohio House of Representatives, and Plaintiff Thomas Ferguson, Ohio's Auditor, were the Democratic members of the 1991 Apportionment Board (the Board). The remaining Plaintiffs are Democratic electors and state legislators, some of whom are members of a protected class under the Voting Rights Act. Plaintiffs

allege that the Plan impermissibly uses race to draw districts and dilutes minority voting strength in violation of § 2 of the Voting Rights Act, 42 U.S.C. § 1973, and the fourteenth and fifteenth amendments to the United States Constitution. Additionally, Plaintiffs assert a pendant state claim that the Plan violates Article XI the Ohio Constitution which provides specific apportionment guidelines.

Defendants George Voinovich, Governor of the State of Ohio, Robert Taft, II, Ohio's Secretary of State, and Stanley Aronoff, President of the Ohio Senate, were the Republican members of the 1991 Apportionment Board. Defendant James Tilling drafted the Plan. Defendants contend that the Voting Rights Act, as amended in 1982, and federal case law required that, wherever possible, they create majority-minority districts, *i.e.*, legislative districts in which members of a minority group comprise the majority.

For reasons which more fully appear hereinafter, we conclude that the Voting Rights Act and federal precedent do not dictate such a *per se* requirement. While creation of such districts may be an appropriate remedy under certain circumstances, Defendants here failed to make the requisite findings which demonstrate a violation of the Voting Rights Act, thereby permitting such a remedy.

## APPLICABLE LAW

In order to understand the rationale by which the Plan was developed, it is necessary to review § 2 of the Voting Rights Act, as amended, and *Armour v. Ohio*, 775 F.Supp. 1044 (N.D.Ohio 1991). In 1982, the Voting Rights Act was amended. The legislative history of the amendment stated that its purpose was "to prohibit any voting practice[ ] or procedure [that] results in discrimination" and "to make clear that proof of discriminatory intent is not required to establish a violation of Section 2." S.Rep. No. 417, 97th Cong., 2d Sess. 2 (1982) U.S.Code Cong. & Admin.News 1982, pp. 177, 179.

Section 2 of the Voting Rights Act, as amended, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2) [42 U.S.C. § 1973b(f)(2) ], as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Thus, the statute does not focus on the purpose or motivation behind the challenged practice or procedure, but the *results* of such practice or procedure. A violation is to be determined by a review of the totality of the circumstances.

The following is a nonexhaustive list of factors relevant to a totality of the circumstances assessment that may be used to establish an unequal opportunity to participate in the political process and elect a candidate of choice:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process (footnote omitted);

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction (footnote omitted).

S.Rep. No. 417, 97th Cong., 2d Sess. 28–29 (1982) U.S.Code Cong. & Admin.News. 1982, pp. 177, 205–207. Additional factors that could have probative value in establishing a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group (footnote omitted).

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous (footnote omitted).

*Id.* at 29.

The Senate Committee noted that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* Whether a § 2 violation has occurred is "based on the totality of the circumstances and guided by those relevant factors in the particular case...." *Id.* at 29 n. 118 U.S.Code Cong. & Admin.News pp. 177, 207. The ultimate "question whether the political processes are 'equally open' de-

pends upon a searching practical evaluation of the 'past and present reality.' " *Id.* at 30.

One month before the Board published the Plan challenged here, the *Armour* court filed its decision. In *Armour,* the plaintiffs alleged that a voting district boundary in Mahoning County drawn under the 1981 apportionment plan which split a large, cohesive Black population between two districts deliberately and effectively diluted the minority vote in violation of § 2 of the Voting Rights Act and the fifteenth amendment. The *Armour* court conducted a "searching practical investigation of the past and present reality" in Mahoning County by applying the totality of the circumstances factors and concluded that the boundary was indeed violative of § 2 of the Voting Rights Act and the fifteenth amendment. Significantly, the Black population divided by the illegal boundary was not large enough to form the majority of a single-member district. Thus, the court in *Armour* recognized that a cohesive group of minority voters could *influence* an election even though they did not comprise a majority in the district. *Armour,* 775 F.Supp. at 1052, 1059–60.

## FACTUAL BACKGROUND

Under the Ohio Constitution, beginning in 1971 and every tenth year thereafter, a five-member apportionment board is to assemble and publish an apportionment plan for the General Assembly. Ohio Const. art. XI, § 1. In accordance with this provision, an apportionment plan was published and became effective in 1981, prior to the 1982 amendment of the Voting Rights Act. Tilling, as author of the 1991 Plan, testified that he tried "to make the necessary changes to bring this current apportionment plan into conformity with the 1982 amendments." (Tilling Dep., Vol. I, at 168). During the end of August 1991 and the beginning of September 1991, Tilling conducted fourteen public meetings throughout Ohio for the purpose of obtaining public comment and minority input on the 1991 Plan.

In his comments at these public hearings, Tilling repeatedly stated that his interpretation of the Voting Rights Act and related federal case law required the creation of a majority-minority district wherever possible. Joint Trial Exhibits, *passim.* For example, at the public hearing in Columbus, Ohio, on August 27, 1991, Tilling stated that to comply with United States Supreme Court guidelines, the Apportionment Board was "under a mandate that wherever a majority-minority district can be created, that must be done." Joint Trial Exhibits, Tab 2, at 12. Tilling also stated that the Board needed to "establish for the record the totality of the circumstances in each urban area" to comply with the Voting Rights Act and the recent decision in *Armour, supra.* (Joint Trial Exhibits, Tab 13, at 33). Black community leaders and other interested persons spoke at the public meetings. The Plan was adopted by the Republican majority on the Board on October 1, 1991, amended on October 3, and published on October 5. Plaintiffs Quilter and Ferguson dissented.

In this action, Plaintiffs allege that under the guise of protecting minority rights by creating majority-minority districts, Defendants have actually packed minorities into certain districts where minorities historically were able to elect representatives of choice with crossover votes. Plaintiffs contend that the packing results in wasting minority votes in the packed districts and diluting minority voting strength in surrounding areas where the "packed" voters could possibly influence elections. Specifically, Plaintiffs allege minority vote dilution resulting from the revision of nine districts which have been represented by either a minority legislator or a white legislator with a 90% to 100% voting record on bills related to minority issues.

With regard to the black legislators, each has been elected to between six and thirteen terms. For the elections between 1984 and 1990, each was elected with an average plurality ranging between 68.27% and 72.64%. Under the 1981 apportionment plan, the black population in their districts ranged from 38.5% to 53.19%. Under the 1991 Plan, the black population in each district was increased between 7.7% and 13.68%. Plaintiffs assert that these increases impermissibly pack black voters in districts where their votes are wasted because there exists substantial crossover voting which allows blacks to elect candidates of choice. Plaintiffs also allege that where these districts were revised, segments of the former district having small minority populations were combined with other districts resulting in the fragmentation and dilution of minority voting strength. Similarly, Plaintiffs allege that the districts represented by the white legislators with responsive voting records on black issues were divided so that portions of the black population were packed into districts with a high percentage of black population or fragmented into districts with such a small percentage of black population that the minority voting strength would be diminished. As justification for these configurations, Defendants assert that the Voting Rights Act and federal case law mandate the drawing of majority-minority districts. We cannot agree.

## ANALYSIS

A. Justification for majority-minority districts

■ The language of § 2 of the Voting Rights Act contains no requirement for majority-minority districts. Rather it prohibits *any* "standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color...." It is directed against certain *results*, regardless of how they are produced. Thus, where the creation of majority-minority districts wastes minority votes by packing and dilutes minority influence by fragmenting, the result is an "abridgement of the right ... to vote on account of race or color" which violates the Voting Rights Act. The United States Supreme Court has recognized this principle:

> Dilution of racial minority group voting strength may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters

or from the concentration of blacks into districts where they constitute an excessive majority. (Citations omitted).

*Thornburg v. Gingles,* 478 U.S. 30, 46 n. 11, 106 S.Ct. 2752, 2764 n. 11, 92 L.Ed.2d 25 (1986). Thus, we can find no *per se* requirement for the creation of majority-minority districts in § 2 of the Voting Rights Act.

Tilling also makes reference to *Gingles, supra,* in justifying his configuration of districts. In *Gingles,* the United States Supreme Court considered a challenge under § 2 of the Voting Rights Act to North Carolina's multimember districting scheme. The Court set forth three preconditions to a § 2 challenge alleging that multimember districts impair minority voters' ability to elect representatives of their choice:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the *multi-member form* of the district cannot be responsible for minority voters' inability to elect its candidates. Second, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests. Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766–67 (emphasis in original) (footnotes and citations omitted).

Apparently, Tilling read the first precondition to require the creation of majority-minority districts wherever possible. However, the Supreme Court in *Gingles* limited these preconditions to challenges to multimember districts:

> The claim we address in this opinion is one in which the plaintiffs alleged and attempted to prove that their ability *to elect* the representatives of their choice was impaired by the selection of a multimember electoral structure. We have no occasion to consider whether § 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multimember district impairs its ability to *influence* elections.
>
> We note also that we have no occasion to consider whether the standards we apply to respondents' claim that multimember districts operate to dilute the vote of geographically cohesive minority groups, that are large enough to constitute majorities in single-member districts and that are contained within the boundaries of the challenged multimember districts, are fully pertinent to other sorts of vote dilution claims, such as a claim alleging that the splitting of a large and geographically cohesive minority between two or more multimember or single-member districts resulted in the dilution of the minority vote.

*Id.* at 46, n. 12, 106 S.Ct. at 2764, n. 12. Thus, *Gingles'* preconditions are not applicable to the apportionment of single-member districts and claims of dilution of minority influence districts at issue here. *Accord, Armour,* 775 F.Supp. at 1052. Therefore, we can find nothing in *Gingles* which establishes a *per se* requirement for the creation of majority-minority districts.

Finally, Defendants suggest that *Armour, supra,* mandates the creation of majority-minority districts. It is true that the court in *Armour* concluded that the division of a cohesive concentration of Black voters between two districts in Mahoning County was violative of § 2 of the Voting Rights Act and the fifteenth amendment. These determinations were made after the court conducted a detailed examination of the totality of the circumstances factors outlined in the legislative history with regard to Mahoning County and Youngstown. While the aggregation of Black voters into one district is an appropriate reme-

dy under certain circumstances, *Armour* does not stand for the proposition that persons responsible for apportionment should create majority-minority districts wherever possible. Thus, we conclude that nothing in § 2 of the Voting Rights Act, *Gingles, supra,* or *Armour, supra,* mandates the drawing of majority-minority districts wherever there is a concentration of Black voters.

### B. Inadequacy of Defendants' totality of circumstances analysis

■ In addition to Tilling's contention that federal statute and case law mandated the creation of majority-minority districts, he justified the Plan by stating that revised districts were necessary "to bring [the 1981] apportionment plan into conformity with the 1982 amendments." Tilling Dep., Vol. 1, at 168. Thus, in essence, Tilling is asserting that the majority-minority configuration was necessary to remedy violations of the Voting Rights Act under the 1981 plan. However, violations of the Voting Rights Act are not to be assumed. The finding of a violation requires an in-depth analysis of the totality of the circumstances in the locality at issue. S.Rep. No. 417, 97th Cong., 2d Sess. 28–29 (1982) U.S.Code Cong. & Admin.News pp. 177, 205–207; *Armour,* 775 F.Supp. at 1053 (our inquiry does not focus on the black experience in the entire state but rather on the political and social reality local to the Mahoning Valley). Although Tilling stated that one of the reasons for the public hearings was to "establish for the record the totality of the circumstances in each urban area ..." Joint Trial Exhibits, Tab 13, at 33, we find the information in the record grossly inadequate in this regard.

■ Key determinations in a totality of the circumstances analysis are whether racially polarized voting exists and the closely related issue of the extent to which minority candidates are elected in the jurisdiction. *Gingles,* 478 U.S. at 55, 106 S.Ct. at 2768–69. The Supreme Court in *Gingles*

provided guidance on determining the whether racially polarized voting[1] is present in a case. The Court noted that the district court relied principally on expert statistical evidence derived through extreme case analysis and bivariate ecological regression analysis on data from three different election years in the challenged districts. *Id.* at 52–53, 106 S.Ct. at 2767–68. These methods are standard in the literature for the analysis of racially polarized voting. *Id.* at 53, n. 20, 106 S.Ct. at 2767, n. 20. The degree of bloc voting which constitutes the threshold of legal significance varies from district to district. *Id.* at 55–56, 106 S.Ct. at 2768–69. However, a showing that a significant number of minority group members vote for the same candidates can establish minority bloc voting within the context of § 2. *Id.* at 56, 106 S.Ct. at 2769. Generally, white voting patterns that normally will defeat the combined strength of minority support and white "crossover" votes is legally significant white bloc voting. *Id.*

■ In the present case, Tilling "concluded that there was significant racial bloc voting throughout the State of Ohio...." Tilling Dep., Def.Exh. 96, at 93. However, Tilling arrived at this conclusion without the benefit of regression analysis. *Id.* at 92. Instead, Tilling examined the votes for the minority representatives to the General Assembly in past elections to try to ascertain racial patterns of voting. Tilling Dep., Vol. I, at 37–39. Tilling admits that he did the analysis using 1990 census data which does not correspond directly to the 1981 districts. *Id.* at 38. Tilling did not reduce his calculations or conclusions to writing. *Id.* at 39. Tilling also examined the results of the primary in which Jesse Jackson ran. Tilling Dep., Vol. II, at 6. Again, he did not subject the data to any statistical analysis. *Id.* at 9.

Tilling further contended that racial bloc voting existed in the districts in which black legislators were being elected with white crossover votes from districts with

---

**1.** The Supreme Court used the terms "racially polarized voting" and "racial bloc voting" interchangeably in *Gingles.* 478 U.S. at 52, n. 18, 106 S.Ct. at 2767, n. 18. The terms are also used interchangeably here.

less than a majority of black voters. Tilling Dep., Vol. I, at 39. When asked specifically if the racial bloc voting in these districts was legally significant, Tilling could not give an unequivocal answer, stating merely that "given the opportunity there is a much higher percentage of black vote for black candidates than white vote for black candidates." *Id.* at 40–41. However, Tilling acknowledged that blacks were elected from districts with as low as 35% black population. *Id.* at 177–78. Ultimately, Tilling increased the black voters in these districts despite the successful election of black legislators with substantial crossover white vote.

It is disturbing that Tilling based his conclusions that there was racial bloc voting and subsequent revisions in the apportionment of voters on such a casual analysis of voting returns. He did not subject his data to statistical analysis or even memorialize his calculations and "findings" in writing. Given the guidance of the Supreme Court in *Gingles* with regard to legally significant racially polarized voting, we conclude that Tilling's analysis does not rise to the level of proof of racially polarized voting.

Another relevant factor is whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the minority community. However, Tilling stated that he did not examine the voting record of any single representative to determine his responsiveness to the minority community. *Id.* at 185. Tilling's information on this factor involved his review of legislators' voting records in preparation for previous Senate campaigns. *Id.* at 179–181. He observed that the information was "part of my mental equipment as I began this process." *Id.* at 180–81.

Review of social and historical factors are also appropriate under a totality of the circumstances review. However, Tilling admitted that he did no studies of the communities at issue except to hold the public hearings. Tilling Dep., Vol. II, at 39. While a few relevant items can be sifted from the voluminous transcripts of the public meetings, there is a paucity of information on these factors in the record. Of the information available, much is anecdotal and seems to be culled from Tilling's personal experience rather than from community sources. For example, when deposed on factors he took into account in his totality of the circumstances analysis, Tilling stated that "in the course of my years in the Senate I have had occasion to talk to many of the minority representatives about various practices that have influenced their ability to fully participate in the process...." Tilling Deposition, Def.Exh. 96, at 97–98. With respect to discrimination in education, Tilling stated that he had spent a year in the late 70's on the Ohio General Assembly's Joint Select Committee on School Desegregation and noted that schools in several of the urban areas in Ohio are under desegregation orders. *Id.* at 97. Tilling also testified that he was aware of the differences in employment figures for minorities and whites in Ohio. *Id.* While Tilling's input on some of these issues could be useful in a totality of the circumstances review, we find that it, even in combination with a series of public meeting compressed into a two and a half week period, falls far short of the "searching practical evaluation of past and present reality" mandated by the legislative history.

Accordingly, we find that no adequate totality of the circumstances analysis was performed by the Board. In the absence of such an analysis, there can be no reliable finding of a violation. In the absence of a violation, there was no legal justification for the Board's "remedy" in the form of the wholesale creation of majority-minority districts. Without such a justification, the Board's plan packs minority voters, with dilutive effects that violate the Voting Rights Act.

### CONCLUSION

For the foregoing reasons, we conclude that there is no legal mandate or finding of a Voting Rights Act violation to justify Defendants' creation of majority-minority districts wherever possible in the 1991 Apportionment Plan. Accordingly, the Board is ORDERED to reconsider the Plan. Un-

less it can show justification under the totality of the circumstances test for the present configuration, the Board must submit a revised plan to this court within 20 days of the date of this order. In the event that a revised plan is not received by this court within the time limit, further action will be taken by this court *sua sponte*.

Because our analysis under the Voting Rights Act requires the Plan to be revised, we decline to address Plaintiffs' claims under the United States Constitution at this time. This is consistent with the judicial preference for deciding cases without reference to questions arising under the Federal Constitution whenever possible. *Hagans v. Lavine*, 415 U.S. 528, 546, 94 S.Ct. 1372, 1383–84, 39 L.Ed.2d 577 (1974) (citing *Siler v. Louisville & Nashville R. Co.* q, 213 U.S. 175, 193, 29 S.Ct. 451, 455, 53 L.Ed. 753 (1909)).

With regard to Plaintiffs' claims under the Ohio Constitution, we note that these claims are before the Ohio Supreme Court in the case of *Ferguson v. Voinovich*, No. 91–1882. While this court is not required to abstain from these issues, *Davis v. Mann*, 377 U.S. 678, 690, 84 S.Ct. 1441, 1447–48, 12 L.Ed.2d 609 (1964), where parallel litigation is instituted in the state and federal courts, it is appropriate for the federal courts to deal with the federal issues and leave the state issues to the state court. We do note, however, that the Board majority claims adherence to the alleged federal mandate to create majority-minority districts wherever possible. Given that we now hold that there is no such mandate, we remove this as a possible defense in any subsequent or concurrent state proceedings.[2]

## DOWD, District Judge, dissenting:

This case brings together a number of developments in Ohio political life. They

---

2. The exigencies of the situation, which include satisfying deadlines, have required counsel for the parties to formulate and present their positions with commendable speed, and have similarly imposed upon this panel a mandate to record the conclusions reached as rapidly as possible. The opportunity of offering an analysis in depth of the thoughtful dissent (which, in fact, we have only seen in outline form) not being available, we refrain from offering a detailed reaction, observing simply that in our view such an analysis only becomes appropriate after an apportionment plan has been shown to have been prepared according to law. The present record is devoid of such a showing.

Some response might, however, be helpful to the parties. First, we must caution against accepting some of the characterizations of the majority opinion by the dissent. For example, it observes, "My colleagues have ruled that the 1991 reapportionment of Ohio for the purposes of electing the Ohio General Assembly violates § 2 of the Voting Rights Act because the majority members of the apportionment created additional majority-minority voting districts in Ohio...." The dissent goes on to state, "Presumably, the Court holds that increasing the minority population in a district where a minority group is already able to elect a minority representative is *per se* packing and wasting minority votes." The dissent further observes that "the majority apparently holds that the districts must be drawn in such a way that the black vote is *maximized*." We made no such holdings. The thrust of the opinion is not to outlaw majority-minority districts nor to create

"a favored race for voting purposes," as the dissent suggests. Rather, the guiding lights are that there is no legal mandate under § 2 of the Voting Rights Act, *Gingles, supra,* or *Armour, supra,* to create majority-minority districts wherever possible. Furthermore, in the absence of a reliable finding of a violation of the Voting Rights Act, it cannot be used as justification for the wholesale creation of majority-minority districts. This highlights the divergent directions from which the majority opinion and dissent proceed. The dissent focuses only on the untested end result, whereas the majority opinion recognizes the vital importance of the process and the pitfalls which arise from a *per se* application of majority-minority districting, *i.e.,* minority vote dilution can result from the concentration of minorities in districts.

Proceeding from their respective approaches, the narrow holding of the majority opinion requires the resubmission of a plan properly premised, while the dissent would put this court in the position of a super-apportionment board—a status which on the basis of abundant authority we decline to occupy. Unlike the dissent, we purposely have not compared and contrasted the plan submitted by the Plaintiffs to the plan adopted by the majority of the Board. The function of this court at this stage of the proceedings is not to choose between two plans, but to measure the plan as adopted against federal law. As stated above, federal law cannot serve as the justification for the present plan. Unless, the Board can show such justification, it must proceed to develop a revised plan which complies with federal and state constitutional law.

include Ohio's attempt by way of constitutional provisions to comply with the one man-one vote mandate of *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the ten year requirement[1] to reapportion[2] the Ohio General Assembly, a change in the demographics in Ohio, including a southward and westward shift in population, the change in the political control of the Ohio Apportionment Board from the Democratic Party to the Republican Party, the impact of the Voting Rights Act as amended in 1982, 42 U.S.C. § 1973, the recognition by both the Republican and Democratic members of the Apportionment Board of the desirability of creating more majority-minority legislative districts in Ohio, and the decision in the *Armour v. State of Ohio*, 775 F.Supp. 1044 (N.D.Ohio 1991) case.

This case, filed on November 1, 1991, required the creation of a three judge panel and, in the context of the remedy sought by the Plaintiffs, prompt action in view of the filing deadline of February 20, 1992 for candidates seeking election to the Ohio General Assembly in the general election in November of 1992.[3]

The three judge panel, mindful of the time constraints, has endeavored to expedite the fact finding process and render a decision so as to avoid uncertainty about the mechanics of the 1992 election for the Ohio General Assembly.[4]

The central feature in this highly charged political controversy that typically accompanies the apportionment of a state for the purposes of electing the state's legislative body is the question of whether the apportionment process should include recognition and consideration of the provisions of Section 2 of the Voting Rights Act. The Defendants answer that question in the affirmative and declare that the complicated procedure of apportionment of necessity included consideration of how to structure the 99 house districts in the urban counties of Ohio where the largest minority populations are located. The position of the Plaintiffs which include the two Democratic members of the apportionment board is less apparent. The Plaintiffs contend that the Apportionment Board did not make any fact findings that support its decision to create additional majority-minority districts and claim the creation of the additional majority-minority districts was contrary to law in the absence of such fact findings in the context of the "totality of the circumstances" test set forth in the legislative history that accompanied the adoption of the 1982 amendment to the Voting Rights Act and which gained additional recognition in the plurality opinion in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). The Plaintiffs additionally claim the number of black voters was increased in a number of districts, contrary to law because the district was already represented by a black incumbent and thus the addition of the black voters constituted "packing" or "wasting" of those black voters. The Plaintiffs also claim, based on a study done with reference to the 1990 Ohio elections, that the number of "influence" districts have been decreased and that such a decrease involves a violation of the Voting Rights Act. In sum the Plaintiffs–Democrats contend that the Defendants–Republicans violated the Voting Rights Act by creating additional majority-minority voting districts in Ohio and also violated the Vot-

1. Ohio Constitution, Article XI, § 1.

2. The words "apportion" and "reapportion" are used interchangeably in the case law. For purposes of my dissent I have used the word apportion as it is used in the Ohio Constitution even though this case involves the reapportionment of the State of Ohio.

3. Ohio conducts a primary election in May in the two major political parties and candidates wishing to run as either the Democratic of Republican candidate must declare by February 20, 1992. Candidates wishing to run as inde-

pendents face more stringent requirements in terms of the number of persons who must sign the candidacy petition, but the petitions themselves need not be filed until after the May primary has been conducted.

4. The Court granted the parties in this case three hours apiece to present their testimony. That procedure was completed on December 17, 1991. Thereafter, counsel filed proposed fact findings on December 30, 1991 and briefs on the merits on January 6, 1992.

ing Rights Act by decreasing the number of "influence" districts.

Additionally, Plaintiffs claim that the 1991 apportionment plan violates the due process provisions of the fourteenth amendment because the 1991 plan constituted partisan gerrymandering. The partisan gerrymandering claim fails for two reasons. First, I find an absence of proof. More importantly, in the absence of an actual election conducted under the 1991 plan, the issue of partisan gerrymandering is premature. *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986).

The Plaintiffs also allege that the Defendants intentionally violated the fifteenth amendment. My colleagues have not addressed the constitutional claims because of the determination that the 1991 apportionment plan violates the Voting Rights Act. Again, I find a total absence of proof of an intentional violation of the fifteenth amendment.

My colleagues have ruled that the 1991 apportionment of Ohio for the purposes of electing the Ohio General Assembly violates § 2 of the Voting Rights Act because the majority members of the apportionment board created additional majority-minority voting districts in Ohio, and have ordered the five members of the apportionment board to revise the plan within 20 days without giving any accurate guidance as to how that process is to be accomplished within the structure of the Ohio constitution or for that matter within the mandates of the Voting Rights Act.

The majority opinion provides a very limited factual background critical to a proper analysis of this case. I am of the opinion that in evaluating an apportionment plan, the district court should be careful to make "detailed findings of facts ..." both to insure a proper analysis of the plan at the district court level and to assist the Supreme Court should appellate review become necessary. *Westwego Citizens for a Better Government v. Westwego*, 872 F.2d 1201, (5th Cir.1989). If one of my fellow judges on this panel had agreed with my position and I had the opportunity to write the Court's opinion, I would have made the fact findings that are attached as Appendix 2 to this dissent. From those fact findings I have distilled a summary of major fact findings which are hereafter incorporated in the body of this dissent.[5]

Article XI of the Ohio Constitution provides a detailed plan for the decennial apportionment of the Ohio General Assembly. The detailed plan calls for the creation of ninety nine separate single member districts for the Ohio House of Representatives and thirty three single member seats in the Ohio Senate. Appendix 1 is a study of the eighty eight Ohio counties setting forth the number of lower house districts allocated on a county by county basis with an indication of the total population and black population of the eighty eight counties.

Bernard Grofman, recognized as a national expert[6] on apportionment issues as they relate to minority interests, has declared in a recent publication, Bernard Grofman, *Voting Rights, Voting Wrongs; The Legacy of Baker v. Carr*, 1990 TWENTIETH CENTURY F. PAPER. 31:

> One approach to eliminating or reducing gerrymandering is through statutory or state constitutional provisions that strictly implement formal criteria such as compactness, equal population, and maintenance of the integrity of political subunits.

My study of the 1991 apportionment process for Ohio in the context of the Ohio Constitutional provisions indicates that the Ohio Constitution and the process for the 1991 apportionment is a mirror of Grofman's recommended approach.

---

**5.** A summary of these findings can be found later in the dissent.

**6.** Writing for the Court in *Thornburg v. Gingles*, 478 U.S. 30, 52, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), Justice Brennan indicated that he "relied principally on statistical evidence presented by ... Dr. Bernard Grofman." Justice Brennan also cited numerous articles written by Dr. Grofman on the issue of apportionment. *Id.* at 47, 53, 106 S.Ct. at 2764, 2767–68.

## SUMMARY OF MAJOR
## FACT FINDINGS

In the interest of brevity and convenience, I have highlighted the fact findings that I submit are most critical to a proper analysis of this case.

1. Article XI of the Ohio Constitution controls the apportionment process for the legislative body for Ohio, the General Assembly, and mandates 99 single member districts for the House of Representatives and a 33 member Senate comprised of three contiguous House Districts.

2. The apportionment process takes place in Ohio every ten years in the year in the decade ending in the number 1 and in reliance on the most recent federal decennial census information. The 1991 apportionment plan for the Ohio General Assembly relies on the 1990 census data.

3. The Ohio Constitution requires that the apportionment process be accomplished on a county by county basis and requires compact districts. Ohio has 88 counties. The first requirement in the apportionment process is to determine the ideal number for a district by dividing the entire state population by 99 and for 1991 this process produced an ideal number of 109,567. Next, single member county districts are mandated in the event the county's total population is with 5% of the ideal number. Four Ohio counties, Warren, Wood, Allen and Columbiana, fell within that computation for 1991. The apportionment board may also create single member districts for counties with a total population that is within 10% of the ideal number. The 1991 plan includes in that latter category an additional three counties, Fairfield, Wayne and Ashtabula. Next, the apportionment board is directed to create districts beginning with the most populous counties with the mandate that where a county has population in excess of the number needed for a single member district, that only one district within the county that is entitled to more than one district may spill over into an adjoining county or counties. By way of example, Cuyahoga County, the most populous county, is entitled to 12.88 districts. Twelve of the districts must be contained wholly within Cuyahoga County and the 13th district will, of necessity, "spillover" into an adjoining county. Twenty six Ohio counties are entitled to at least one district within the county. The remaining 62 counties have a population less than 90% of the ideal number for a district and therefore must be combined with other counties to create a house district.[7]

4. The apportioning process for the Ohio General Assembly is done by two persons appointed from the Ohio General Assembly with each of the two major political parties represented. The remaining three are the elected governor, auditor of state, and secretary of state. In 1971 and 1981, the apportioning process was controlled by a majority from the Democratic party and in 1991 by a majority from the Republican party.

5. In addition to the Ohio constitutional provisions that control apportionment, Section 2 of the Voting Rights Act as amended in 1982 and recently interpreted in the *Armour* case that struck down the 1981 apportionment as it related to Mahoning County, was considered by the members of the apportioning board in 1991.

6. The black minority population in Ohio is predominantly located in its six major urban counties of Cuyahoga (24.9%), Franklin (15.9%), Hamilton (10.9%), Montgomery (17.7%), Summit (11.9%) and Lucas (14.8%). Those six counties account for approximately forty four of the ninety nine house districts and are presently represented by 11 minority representatives even though the total black population of the six counties (according to 1990 census figures) is only 19.1% of the total population of the six counties, i.e., 915,628 of a total population of 4,790,965.

As indicated in the 1990 census, the total population of Ohio is in excess of 10 million people, and with only a modest change from the 1980 census. Ohio experienced a net gain in population of approximately 50,000 people. However, there were signif-

---

7. *See* Appendix 1.

icant population shifts within the state. Specifically, there occurred a substantial shift in population from the Northeast quadrant of the state to the Central and Southwest portions of the state, particularly to Franklin, Delaware, Union and Madison counties. There also occurred a population shift from Cincinnati and Hamilton County to Butler, Clermont and Warren counties. Cuyahoga County lost one entire house district in population (109,000 people) while Franklin County gained one entire house district. Franklin County replaced Hamilton County as the second most populous county in the state. There were also significant population shifts from the inner cities to the suburbs.[8]

7. As a result of major population shifts within counties and from the inner city to the suburbs, the majority of the 1981 configured districts in the six major urban counties had to be reconfigured to meet the population requirements of Article XI, Section 3 of the Ohio Constitution.[9]

8. By way of summary, the 1991 Apportionment Plan creates four (4) majority-minority districts in Cuyahoga County with a black voting age population of 58.36%, 61.41%, 65.13% and 63.42%. The prior 1981 districts had only three (3) majority-minority districts with a black population of 74.-80%, 90.05%, and 94.67%. The 1991 Minority Plan proposed by Plaintiffs Ferguson and Quilter similarly has four majority-minority districts with black voting age populations of 60.18%, 63.71%, 66.67% and 67.08%.[10]

The 1991 Apportionment Plan also creates a strong influence district in Cuyahoga County of 40.61% compared to an influence district of only 26.46% in the 1991 Minority Plan proposed by Plaintiffs Ferguson and Quilter.[11]

The 1991 Apportionment Plan has one (1) majority-minority district in Franklin County at 50.30% black voting age population where none existed in the 1980 apportionment. The 1991 Apportionment Plan also has a strong influence district at 44.31%. By way of comparison, the 1991 Minority Plan proposed by Plaintiffs' Ferguson and Quilter also has one (1) majority-minority district at 50.60% black voting age population and one influence district at 46.40%. Significantly, part of the rationale in the 1991 Apportionment Plan for increasing relative black percentages in Franklin County house districts from the 1981 plan was to create a Senate influence district in Franklin County.[12]

The 1991 Apportionment Plan creates two (2) majority-minority districts in Hamilton County where only one existed in the 1981 apportionment. The majority-minority districts in the 1991 Apportionment Plan have black voting age populations of 52.-60% and 56.83%. By way of comparison, the 1991 Minority Plan proposed by Plaintiffs Ferguson and Quilter also reflects one (1) majority-minority district at 57.91%. The 1991 Apportionment Plan also reflects an influence district of 21.58% compared to 19.55% in the 1991 Minority Plan proposed by Plaintiffs Ferguson and Quilter.

The 1991 Apportionment Plan reflects one (1) majority-minority district in Montgomery County, where none existed in the 1981 apportionment. The 1991 Apportionment Plan has a district with a black voting age population of 50.70% and an influence district at 29.23%. By way of comparison, the plan presented by Plaintiffs Ferguson and Quilter has no majority-minority districts and two influence districts at 36.20% and 45.26%. Plaintiffs challenge no districts in Montgomery County.

The 1991 Apportionment Plan reflects a slight increase in black population in House District 42, in Summit County, currently represented by minority incumbent Representative Sykes. The increase is from 35.-40% to 43.26% black population. By way of comparison, the 1991 Minority Plan pro-

---

**8.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 61–63.

**9.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 79–80.

**10.** *See* Defendants' Exhibit 77.

**11.** Defendants' Exhibit 77.

**12.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 103–104.

posed by Plaintiffs Ferguson and Quilter also increases the black population in Representative Sykes' district from 35.40% to 47.20%. Plaintiffs challenge no districts in Summit County.

The 1991 Apportionment Plan reflects an increase in black population in House District 45, in Lucas County, which is comparable to the district currently represented by minority incumbent Representative Casey Jones. The black voting age population in Jones' district was increased to 47.-65% compared to 44.98% in the 1991 Minority Plan proposed by Plaintiffs Ferguson and Quilter. The black populations in House Districts 45 and 47 in the 1991 Apportionment Plan are substantially similar to the 1991 Apportionment Plan proposed by Plaintiffs Ferguson and Quilter.

In Stark County, there is not sufficient black population to form a majority-minority district.

The districts in Mahoning County are configured pursuant to the order of the Federal District Court in *Armour v. State of Ohio*, 775 F.Supp. 1044 (N.D.Ohio 1991).

Overall, there are eight (8) majority-minority districts in the 1991 Apportionment Plan compared to only four (4) in the 1981 apportionment and six (6) in the 1991 Minority Plan proposed by Plaintiffs Ferguson and Quilter.

In the 1991 Apportionment Plan, there are twenty (20) districts with over 10% black voting age population, which is the same number as in the 1991 Minority Plan proposed by Plaintiffs Ferguson and Quilter.

9. In drafting the 1991 Plan, Mr. Tilling worked closely with the leaders of various minority groups in Ohio. Further, minority groups had substantial input in the creation of the final plan that was submitted to the state legislature.

10. Proposed apportionment plans were submitted by numerous minority special in-terest groups. Among those submitted, were the plans from Black Elected Democrats of Ohio (BEDO) and the Ohio Conference of Branches of the NAACP.

On September 30, 1991, the Apportionment Board met to hear testimony from the various proponents of the proposed plans.[13]

On October 1, 1991, the Apportionment Board met again to consider adoption of a final plan of apportionment. The meeting was recessed from time to time to permit discussions among representatives of BEDO and the NAACP and Mr. Tilling to attempt to reach a consensus concerning minority districts.[14]

These discussions were initiated by Mr. Tilling after representatives of BEDO and the NAACP failed to reach a consensus regarding minority districts. Mr. Tilling contacted Congressman Louis Stokes to attempt to bring the minority groups together. Mr. Tilling initiated these discussions since he knew that minority voting issues would be the focal point of the apportionment process.[15]

11. During the public hearing conducted on October 1, 1991, BEDO and the NAACP reached a consensus regarding the establishment of minority districts in Cuyahoga County in the final 1991 apportionment plan. The NAACP accepted BEDO's proposal for Cuyahoga County, establishing four majority-minority districts and one influence district in Cleveland. The NAACP's original plan established five majority-minority districts in Cuyahoga County. The plan originally submitted by the Board also called for five majority-minority districts in Cuyahoga County.[16]

On October 1, 1991, BEDO offered the consensus position with regard to the districts in Cuyahoga County as an amendment to the BEDO plan (referred to herein as the "BEDO Amendment"). The BEDO Amendment was also offered as an amendment to the plan proposed by the majority

**13.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 36–37.

**14.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 38–40.

**15.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 38, 39, 42.

**16.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 40, 43.

of persons responsible for apportionment.[17] The amendment was accepted by the Apportionment Board and incorporated in the final 1991 Apportionment Plan.[18]

12. At the meeting of October 1, 1991, Dana Mattison [19] and Senator Jeff Johnson, a minority Senator from Cuyahoga County, endorsed the BEDO Amendment creating four majority-minority districts. Floyd Johnson, on behalf of the NAACP, endorsed the entire 1991 Apportionment Plan.[20]

The BEDO Amendment was endorsed by William Mallory, President of BEDO and Congressman Stokes.[21]

The Ohio Conference of Branches of the NAACP endorsed the 1991 Apportionment Plan in its entirety.[22]

13. The 1981 apportionment plan for Ohio created 24 districts with a ten percent (10%) or more minority voters. Two of those districts were in Mahoning County and the *Armour* decision required that the two districts be realigned to place all minority voters in one of the two districts. The 1981 apportionment plan also created as a part of the 24 districts, four majority-minority districts, three in Cuyahoga County with a percentage of blacks as high as 94.67% and one in Hamilton County with a percentage of black voters fixed at 53.2%. The 1991 apportionment plan created eight majority-minority districts and the number of districts with at least a 10% minority voting population is 20. In sum, the 1991 apportionment plan, in comparison to the 1981 plan, has increased the number of majority-minority districts by four and reduced the number of districts with 10% or more black voters by four. *See* Appendix 1.

## History of Apportionment Law

### A. *Introduction*

In reviewing an apportionment plan developed by a legislature, a district court is guided by a number of constraints. First, the district court must only determine whether that plan is acceptable under the prevailing law, and not whether another plan would be more advantageous to the parties at interest. *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Second, deference is to be extended to a apportionment plan advanced by the legislature. *Terrazas v. Clements,* 537 F.Supp. 514 (N.D.Texas 1982). It is with these considerations in mind that I evaluate the Plaintiffs' case.

### B. *One Man One Vote*

The cases that first spoke to the requirements of apportioned voting districts focused on the ideal that each citizen should have an equal voice in his or her government. The way in which most citizens are heard in their government is through their vote on election day. Thus, in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Court held that each citizen's vote must carry the same weight in determining the outcome of a political election. The holding in *Baker* has come to be known as the "one man, one vote" rule, and has been followed ever since. As the Court in *Gaffney v. Cummings,* 412 U.S. 735, 741, 93 S.Ct. 2321, 2325, 37 L.Ed.2d 298 (1973) noted:

> 'The requirement of Art. I § 2 of the Constitution, that representatives be chosen 'by the People of the several states,' mandates that one man's vote in a congressional election is to be worth as much as another's.'

**17.** Deposition of James R. Tilling, Defendants' Exhibit 96, p. 41.

**18.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 40, 44.

**19.** Dana Mattison is the Executive Director of BEDO. Deposition of Dana Mattison, Defendant's Exhibit 82, sub exhibit C; p. 14.

**20.** Deposition of James R. Tilling, Defendants' Exhibit 96, p. 40; Deposition of Dana Mattison, Defendants' Exhibit 82, pp. 83–89; Deposition of Floyd Johnson, Defendants' Exhibit 97, p. 58.

**21.** Deposition of Dana Mattison, Defendants' Exhibit 82, pp. 89, 90, 91.

**22.** Deposition of Floyd Johnson, Defendants' Exhibit 97, pp. 57–59.

(*quoting Wesberry v. Sanders*, 376 U.S. 1, 8, 84 S.Ct. 526, 530, 11 L.Ed.2d 481 (1964).

### C. *Voting Rights Act § 2*

In order to give effect to the "one man one vote" principle, Congress enacted the Voting Rights Act. 42 U.S.C. § 1973. In 1982, one year after the Democratic party controlled 1981 Apportionment Plan was adopted, § 2 was amended to eliminate the requirement of evidence of invidious, intentional discrimination in order to prove a voting Rights Act violation. In *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), the Court held that disproportionate effect, alone, was insufficient to prove unlawful vote dilution. In response to cases such as *Mobile*, Congress passed in 1982, an amendment to § 2 of the Voting Rights Act that removed the requirement of invidious, intentional discrimination. *Garza v. City of Los Angeles*, 918 F.2d 763 (9th Cir.1990). As my colleagues point out, the focus now is on the *results* of the apportionment plan.

In evaluating the results of the plan, the court must take into account not only the deviations from the acceptable norm for population distribution, but also the extent of the deviation. Judicial apportionment plans have been held to very high standards, finding that even minor deviations violate the Voting Rights Act. Legislative apportionment plans have been afforded more leeway. Generally, legislative apportionment is guided by the "under 10% deviation" rule, finding that population deviations from the ideal norm that are less than 10% are *de minimis*. *Connor v. Finch*, 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977); and *Wyche v. Madison Parish Police Jury*, 635 F.2d 1151 (5th Cir.1981). *See eg. Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) (7.83% deviation from population norm was acceptable); and *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) (9.9% deviation acceptable).

## ANALYSIS

### Voting Rights Act

The majority begins its analysis of the case by noting that the Plaintiffs have alleged that the 1991 Plan violates the Voting Rights Act by impermissibly considering race in the drawing of district lines, serving to dilute the minority vote in the process. Before focusing on the 1991 Plan, however, the majority turns its attention to the merits of the 1981 Plan.[23]

The majority opinion argues that the 1991 Apportionment Plan must be rejected because the majority board, and namely Mr. Tilling, did not prove that the 1981 Apportionment Plan violated the Voting Rights Act. Specifically, the majority declares that under the totality of the circumstances test, it was not demonstrated that the 1981 plan violated the Voting Rights Act.[24] The majority reasons that absent such a showing, the majority board was not entitled to apportion the state.

The majority opinion appears to declare that the Voting Rights Act requires that there be an established violation before an apportionment board is entitled to apportion a district with a significant black population. This argument places the cart before the horse because the totality of the circumstances test, derived from the Voting Rights Act, is a tool that is to be utilized by the district court in evaluating the *plan before it*, and not as a prerequisite to redistricting.

In *Reynolds v. Sims*, the court held that the court's purpose in apportionment cases is not to determine which plan would be most appropriate in terms of fair and equal redistricting, but rather whether the plan before it violates the Voting Rights Act. Since I do not believe that the 1991 Plan

---

**23.** My colleagues do address the "process" used by the majority board in arriving at the 1991 plan. A criticism of the "process analysis" will follow.

**24.** The majority's conclusion that the 1991 Reapportionment Board was not entitled to reapportion the state is especially remarkable when one considers the fact that one district in Cuyahoga County contained a black population in excess of 94%. Such a figure must be considered packing under any judicial or legislative standard.

violates the Voting Rights Act, I am of the view that it should be implemented.

While the majority opinion does not directly evaluate the 1991 Plan, it does criticize the process used by the majority board in developing the 1991 Plan. The majority opinion claims that Mr. Tilling's recommendation to create majority-minority districts whenever possible was inappropriate and not mandated by the Voting Rights Act. In my view, a § 2 of the Voting Rights Act as amended in 1982 and as interpreted by *Gingles* and *Armour* sends an unambiguous signal that a apportioning process must consider the impact of the apportioning on the minority rights of the voting persons. The majority opinion is ambivalent when one considers the fact that the Plaintiffs Ferguson and Quilter advanced their plan for apportionment which created an additional *two* majority-minority districts as opposed to the additional *four* such districts created by the adopted plan.

Rather than focus on the process used by the majority in arriving at the 1991 Plan, I submit that the Court should be concentrating on the result. It is only when the creation of majority-minority districts serves to dilute the minority vote that the Voting Rights Act is violated. The facts do not support the majority's conclusion that the 1991 Plan violates the Voting Rights Act.

The majority's determination that the Defendant members of the majority board have been unable to demonstrate that the Voting Rights Act mandates the redistricting found in the 1991 Plan omits several important observations. The Court completely ignores the fact that there were substantial population shifts in the state of Ohio since 1981. Based on the total population as calculated by the 1990 census, the ideal district population was 109,567, and the allowed range was between 104,089 and 115,045. Twenty seven of the forty four districts in the six large urban counties, as defined by the 1981 Apportionment Plan, did not fall within the 5% deviation specified in the Ohio Constitution.[25] Specifically, nine districts in Cuyahoga County, sev-

en districts in Hamilton County, six districts in Franklin County, three districts in Montgomery County, and two districts in Lucas County, had to be reconfigured because of the population shifts subsequent to the 1981 apportionment.

An apportionment board has an obligation to apportion when the districts do not meet the population requirements based on the total population of the state divided by the number of districts designated in the state's constitution. *Garza v. City of Los Angeles,* 918 F.2d 763 (9th Cir.1990). Left uncorrected, population shifts can, and I believe would in this case, result in a situation where the vote of one individual in one part of the state is of unequal weight as the vote of another individual located elsewhere in the state. That is why in *Garza,* the court held that the legislature has a *duty* to apportion when substantial population shifts occur in order to avoid a Voting Rights Act violation, and that is why I believe that apportionment on a grand scale was warranted and, indeed, necessary in this instance.

The majority is also critical of the fact finding process engaged in by Mr. Tilling. Specifically, the majority takes issue with Mr. Tilling's determination that racial bloc voting existed under the 1981 Plan. The majority indicates that Mr. Tilling did not engage in bivariate ecological regression analysis. Again, I respectfully submit that it was not the duty of the majority board to find racial bloc voting in order to justify the 1991 Plan.

The majority also discounted Mr. Tilling's findings of lack of responsiveness to the black community. The majority claims that his evidence is mostly "anecdotal ... rather than from community sources." The record indicates otherwise. Mr. Tilling met with the leaders of every major minority group in the state of Ohio. He held public hearings inviting comments and criticisms from these groups, and accepted proposed plans from the various groups. Further, the record supports the conclusion that the 1991 Plan was largely the result of

---

**25.** *See* Ohio Constitution, Article XI, § 10(A).

the collaboration of several minority groups working with the majority board.

In one of its few fact findings, the majority notes that in nine unspecified districts with either minority legislators or white legislators with a 90% to 100% voting record on bills related to minority issues, the 1991 plan increases the black population in each district. The Court observes that under the 1981 Plan the black population in these districts ranged from 38.5% to 53.19%, and that under the 1991 Plan the black population in each district was increased between 7.7% and 13.68%. Presumably, the Court holds that increasing the minority population in a district where a minority group is already able to elect a minority representative is *per se* packing and wasting minority votes.

Initially, such an argument ignores the fact that there were substantial population shifts in eleven districts represented by black legislators. Moreover, the black population in the six major urban counties has increased by 7.3%, while the white population has decreased by 1.67%. As Appendix 1 to this opinion demonstrates, the minority population in Cuyahoga County increased by 9,182, the minority population in Franklin County increased by 21,824, Hamilton County experienced a 15,151 increase, and Montgomery County noticed a 2,112 increase. Only Summit and Lucas County experienced a decrease in minority population. The additional black voters had to be placed in some district. Principles of geographical compactness dictate their placement, thus leading to an overall increase in the black population in the districts in question.[26]

By arguing that the 1991 Plan is invalid because it increased the black population in districts where blacks were already able to effectively elect candidates of their choice, the majority apparently holds that the districts must be drawn in such a way that the black vote is *maximized.* Putting concerns of geographical compactness aside for the moment, I do not believe that the

Voting Rights Act entitles any group, including white Democratic incumbents, to such preferential treatment. The Voting Rights Act prohibits the district lines to be drawn so that a minority's vote is *diluted* in such a way that they do not possess an equal opportunity to participate in the electoral process. By holding that the black vote must be maximized, the majority is, in essence, creating a favored race for voting purposes. I find that this was not the intention of Congress when it enacted the Voting Rights Act and subsequently amended the Act in 1982. Moreover, I find no judicial precedent for such a position.

Finally, it is difficult to find that there has been impermissible minority vote dilution in Ohio when one considers the fact that the blacks have been able to consistently elect more representatives in the six major urban counties than their percentage of the population would suggest. While blacks represented only 17.71% of the population under the 1980 census, black representation comprises 25% of the members of the House of Representatives for these six counties.

### Fifteenth Amendment

Another avenue for relief for vote dilution is the fifteenth amendment. The Plaintiffs claim that they are entitled to relief under the fifteenth amendment because racial considerations played a part in the formation of the 1991 Apportionment Plan. The majority does not reach Plaintiffs' fifteenth amendment claim because it finds that the Defendant majority board members cannot establish a Voting Rights Act violation that would entitle them to redraw district lines in an attempt to create majority-minority districts. Since I believe both that the majority applied the wrong analysis, and that under the proper analysis no Voting Rights Act violation exists, I must address Plaintiffs' fifteenth amendment claim.

---

**26.** I wish to note that the claim is often raised that there is a flaw in the census taking procedure which results in an undervaluation of the existing black population. In that context the

Court notes that the majority minority districts as created by the 1991 Apportionment Plan all contain a population that is *below* the ideal number of 109,567.

The United States Constitution Article XV states: "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude." Unlike a claim under the Voting Rights Act, an aggrieved minority voter must show intentional discrimination in order to prevail on a fifteenth amendment violation. *Garza, supra.; Ketchum v. Byrne,* 740 F.2d 1398 (7th Cir.1984); *Mobile, supra; Armour v. State of Ohio,* 775 F.Supp. 1044 (N.D.Ohio 1991); and *Jeffers v. Clinton,* 740 F.Supp. 585 (E.D.Ark.1990). Thus, to prove a fifteenth amendment violation, the minority voter must establish: (1) actual intent to discriminate; and (2) injury as a direct result of discrimination. *Armour, supra.;* and *Jeffers, supra.*

The leading case on fifteenth amendment violations in relation to apportionment plans is *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). In *Gomillion,* blacks challenged the redrawing of a district that eliminated all but four or five of its original 400 black voters without eliminating any white voters. In finding intentional black voter dilution, the Court relied on the result as well as the fact that the redistricting changed the district from a simple square to an irregular 28 sided figure. The Court held that such maneuvering was highly suspect. In so holding, the Court noted that: "[w]hen a legislature thus singles out a readily isolated segment of a racial minority for special discriminatory treatment, it violates the 15th Amendment." *Id.* at 346, 81 S.Ct. at 129–30.

It is undisputed that the Defendant majority board members took race into consideration in creating the 1991 Apportionment Plan. Mr. Tilling repeatedly indicated in his deposition testimony and the facts presented at trial revealed that he was sensitive to the concerns of black political groups and worked with these groups to create the 1991 Plan. Plaintiffs argue that the fact that race was a consideration in drawing the district lines supports the finding of a fifteenth amendment violation.

Mere consideration of race, without more, is not sufficient to establish a fifteenth amendment violation. As the *Gomillion* Court noted, only specific discriminatory treatment violates the fifteenth amendment. Further, this Court in *Armour* held that there must be intentional diluting for political reasons in order to sustain a fifteenth amendment claim.

In this case, racial considerations did, indeed, play a part in the creation of the 1991 Apportionment Plan. Racial *discrimination,* however, did not. Under *Gomillion,* it is clear that there must be racial discrimination before a fifteenth amendment violation can be found. Plaintiffs have been unable to demonstrate an intent to discriminate. The evidence bears out that the Defendants considered race not for the purpose of discriminating against black voters, but rather to avoid violating the Voting Rights Act. If anything, the Defendants' consideration of race served to enhance the black vote. In light of these facts, I would not find a fifteenth amendment violation.

### Ohio Constitution

This leaves just the Plaintiffs' claims under the Ohio Constitution. I agree with my colleagues that in light of the fact that these issues are pending before the highest court in Ohio, we should abstain.

### Conclusion

In my view, judicial restraint in connection with apportionment of a state for legislative purposes is justified where:

1. The apportionment process has been completed in a manner consistent with the state's constitution.

2. The entire legislative body is elected on the basis of single member districts.

3. The apportionment of the state based upon the 1990 census figures does not violate the ten percent deviation rule adopted by the United States Supreme Court in *Connor v. Finch, supra.* in connection with continued compliance with the *Baker v. Carr, supra.* one man—one vote mandate.

4. The six urban counties in the state where the black population is primarily lo-

cated are entitled to forty four of the ninety nine seats in the Ohio legislature and of those forty four districts, eleven are currently represented by minority representatives and there is no indication in the evidence before the Court that the apportionment has jeopardized the opportunity of the minority populations of the six counties to continue to elect the incumbent minority representatives.

5. The apportionment process was for the first time conducted in an open public manner with great deference to the black constituency in the six urban counties.

6. No election has yet been conducted.

7. Active judicial intervention in the apportionment process within approximately three weeks of the deadline for candidates to file for both the legislature and the senate threatens to work a hardship on the election process for the State of Ohio in 1992.

I am of the view that this case mandates judicial restraint. The Plaintiffs' have been unable to meet their burden of establishing a violation of the Voting Rights Act or the fifteenth amendment. Presented with a suitable plan, the Court should implement the 1991 Apportionment Plan and insure for Ohio an orderly election process in 1992.

## APPENDIX 1
### URBAN COUNTIES WITH BLACK INCUMBENT LEGISLATORS

| | COUNTY | NO. DIST.[1] | 1990 POP.[2] | 1990 BLACK POP.[3] | % BLACK | BLACK INC. LEGISLATOR[4] | 1980 POP.[5] | 1980 BLACK POP.[6] | % BLACK | M/M-×10%[7] |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Cuyahoga | 12.88 | 1,412,140 | 350,185 | 24.8 | 3 | 1,498,400 | 341,003 | 22.76 | 4–1 |
| 2. | Franklin | 8.77 | 961,437 | 152,840 | 15.9 | 2 | 869,126 | 131,016 | 15.07 | 1–1 |
| 3. | Hamilton | 7.90 | 866,228 | 181,145 | 20.9 | 2 | 873,204 | 165,994 | 19.01 | 2–1 |
| 4. | Montgomery | 5.24 | 573,809 | 101,817 | 17.7 | 2 | 571,697 | 94,561 | 16.54 | 1–1 |
| 5. | Summit | 4.70 | 514,990 | 61,185 | 11.9 | 1 | 524,990 | 56,831 | 10.84 | 0–1 |
| 6. | Lucas | 4.22 | 462,361 | 68,456 | 14.8 | 1 | 471,741 | 63,901 | 13.55 | 0–1 |
| | TOTALS | 43.71 | 4,790,965 | 915,628 | 19.1 | 11 | 4,808,640 | 853,306 | 17.75 | |

### COUNTIES WITH POPULATION THAT EXCEEDS A SINGLE NUMBER DISTRICT

| | COUNTY | NO. DIST. | 1990 POP. | 1990 BLACK POP. | % BLACK | BLACK INC. LEGISLATOR | 1980 POP. | 1980 BLACK POP. | % BLACK | M/M-×10% |
|---|---|---|---|---|---|---|---|---|---|---|
| 7. | Stark | 3.26 | 367,585 | 25,052 | 6.82 | | 378,823 | 24,111 | 6.36 | 0–1 |
| 8. | Butler | 2.66 | 291,479 | 13,134 | 4.51 | | 258,787 | 12,072 | 4.66 | 0–0 |
| 9. | Lorain | 2.47 | 271,126 | 21,230 | 7.83 | | 274,909 | 19,813 | 7.21 | 0–1 |
| 10. | Mahoning | 2.42 | 264,806 | 39,681 | 14.98 | | 289,437 | 41,075 | 14.19 | 0–1 |
| 11. | Trumbull | 2.08 | 227,813 | 15,221 | 6.68 | | 241,863 | 14,605 | 6.04 | 0–1 |
| 12. | Lake | 1.97 | 215,499 | 3,528 | 1.64 | | 212,801 | 198 | .09 | 0–0 |
| 13. | Clermont | 1.37 | 150,187 | 1,291 | .86 | | 128,483 | 921 | .72 | 0–0 |
| 14. | Clark | 1.35 | 147,548 | 13,031 | 8.83 | | 150,236 | 13,173 | 8.77 | 0–1 |
| 15. | Portage | 1.30 | 142,585 | 3,906 | 2.74 | | 135,856 | 3,571 | 2.63 | 0–0 |
| 16. | Green | 1.25 | 136,731 | 9,611 | 7.03 | | 129,769 | 8,792 | 6.78 | 0–0 |
| 17. | Licking | 1.17 | 128,300 | 2,217 | 1.73 | | 120,981 | 2,036 | 1.68 | 0–0 |
| 18. | Richland | 1.15 | 126,137 | 9,981 | 7.91 | | 131,205 | 9,373 | 7.14 | 0–0 |
| 19. | Medina | 1.12 | 122,354 | 850 | .69 | | 113,150 | 709 | .63 | 0–0 |
| | TOTALS | | 2,592,150 | 158,733 | 6.12 | | 2,566,300 | 150,449 | 5.86 | |

### COUNTIES WITH A POPULATION WITHIN A FIVE PERCENT DEVIATION OF THE IDEAL POPULATION DISTRICT OF 109,567 MANDATING A SINGLE MEMBER DISTRICT FOR THE COUNTY [8]

| | COUNTY | NO. DIST. | 1990 POP. | 1990 BLACK POP. | % BLACK | BLACK INC. LEGISLATOR | 1980 POP. | 1980 BLACK POP. | BLACK | M/M-×10% |
|---|---|---|---|---|---|---|---|---|---|---|
| 20. | Warren | | 113,909 | 2,415 | 2.12 | | 99,276 | 1,711 | 1.72 | 0–0 |
| 21. | Wood | | 113,269 | 1,168 | 1.03 | | 107,372 | 1,308 | 1.22 | 0–0 |
| 22. | Allen | | 109,755 | 12,313 | 11.22 | | 112,241 | 10,975 | 9.78 | 0–1 |
| 23. | Columbiana | | 108,276 | 1,409 | 1.30 | | 113,572 | 1,409 | 1.24 | 0–0 |
| | TOTALS | | 445,209 | 17,305 | 3.89 | | 432,461 | 15,403 | 3.56 | 8–12 |

**COUNTIES WITH A POPULATION WITHIN A TEN PERCENT DEVIATION OF THE IDEAL POPULATION DISTRICT OF 109,567 PERMITTING A SINGLE MEMBER DISTRICT FOR THE COUNTY** [9]

| | COUNTY | NO. DIST. | 1990 POP. | 1990 BLACK POP. | % BLACK | BLACK INC. LEGISLATOR | 1980 POP. | 1980 BLACK POP. | % BLACK | M/M—×10% |
|---|---|---|---|---|---|---|---|---|---|---|
| 24. | Fairfield | 1.1 | 103,461 | 1,153 | 1.11 | | 93,678 | 319 | .34 | |
| 25. | Wayne | 1.53 | 101,461 | 1,557 | 1.53 | | 97,408 | 1,244 | 1.28 | |
| 26. | Ashtabula | 3.14 | 99,821 | 3,138 | 3.14 | | 104,215 | 3,060 | 2.94 | |
| | TOTALS | | 304,743 | 5,848 | 1.92 | | 295,301 | 4,623 | 1.57 | |

**COUNTIES WITH A POPULATION THAT IS INSUFFICIENT TO PERMIT THE COUNTY CONSTITUTING A SINGLE MEMBER DISTRICT AND THUS REQUIRING THAT THE COUNTY BE PAIRED WITH ANOTHER COUNTY TO CREATE A SINGLE MEMBER DISTRICT**

| | COUNTY | NO. DIST. | 1990 POP. | 1990 BLACK POP. | % BLACK | BLACK INC. LEGISLATOR | 1980 POP. | 1980 BLACK POP. | % BLACK | M/M—×10% |
|---|---|---|---|---|---|---|---|---|---|---|
| 27. | Adams | | 25,371 | 47 | .19 | | 25,328 | 36 | .14 | |
| 28. | Ashland | | 47,507 | 460 | .97 | | 46,178 | 312 | .68 | |
| 29. | Athens | | 59,549 | 1,878 | 3.15 | | 56,399 | 1,653 | 2.93 | |
| 30. | Auglaize | | 46,585 | 66 | .14 | | 42,554 | 37 | .09 | |
| 31. | Belmont | | 71,074 | 1,308 | 1.84 | | 82,569 | 1,592 | 1.93 | |
| 32. | Brown | | 34,966 | 406 | 1.16 | | 31,920 | 411 | 1.29 | |
| 33. | Carroll | | 26,521 | 135 | .51 | | 25,598 | 115 | .45 | |
| 34. | Champaign | | 36,019 | 992 | 2.75 | | 33,649 | 979 | 2.91 | |
| 35. | Clinton | | 35,415 | 716 | 2.02 | | 34,603 | 714 | 2.06 | |
| 36. | Coshocton | | 35,427 | 415 | 1.17 | | 36,024 | 414 | 1.15 | |
| 37. | Crawford | | 47,870 | 253 | .53 | | 50,075 | 301 | .60 | |
| 38. | Darke | | 53,619 | 184 | .34 | | 55,096 | 170 | .31 | |
| 39. | Defiance | | 39,350 | 493 | 1.25 | | 39,987 | 219 | .55 | |
| 40. | Delaware | | 66,929 | 1,424 | 2.13 | | 53,840 | 1,259 | 2.34 | |
| 41. | Erie | | 76,779 | 6,312 | 8.22 | | 79,655 | 5,888 | 7.39 | |
| 42. | Fayette | | 27,466 | 662 | 2.41 | | 27,467 | 724 | 2.64 | |
| 43. | Fulton | | 38,498 | 93 | .24 | | 37,751 | 40 | .11 | |
| 44. | Gallia | | 30,954 | 871 | 2.81 | | 30,098 | 913 | 3.03 | |
| 45. | Geauga | | 81,129 | 1,056 | 1.30 | | 74,474 | 990 | 1.33 | |
| 46. | Guernsey | | 39,024 | 616 | 1.58 | | 42,024 | 637 | 1.52 | |
| 47. | Hancock | | 65,536 | 591 | .90 | | 64,581 | 523 | .81 | |
| 48. | Hardin | | 31,111 | 236 | .76 | | 32,719 | 211 | .64 | |
| 49. | Harrison | | 16,085 | 393 | 2.44 | | 18,152 | 470 | 2.59 | |
| 50. | Henry | | 29,108 | 147 | .51 | | 28,383 | 101 | .36 | |
| 51. | Highland | | 35,728 | 692 | 1.94 | | 33,477 | 683 | 2.04 | |
| 52. | Hocking | | 25,533 | 234 | .92 | | 24,304 | 117 | .48 | |
| 53. | Holmes | | 32,849 | 52 | .16 | | 29,416 | 10 | .03 | |
| 54. | Huron | | 56,240 | 597 | 1.06 | | 54,608 | 577 | 1.06 | |
| 55. | Jackson | | 30,230 | 218 | .72 | | 30,592 | 207 | .68 | |
| 56. | Jefferson | | 80,298 | 4,488 | 5.59 | | 91,564 | 5,047 | 5.51 | |
| 57. | Knox | | 47,473 | 381 | .80 | | 46,304 | 294 | .63 | |
| 58. | Lawrence | | 61,834 | 1,559 | 2.52 | | 63,849 | 1,541 | 2.41 | |
| 59. | Logan | | 42,310 | 804 | 1.90 | | 39,155 | 711 | 1.82 | |
| 60. | Madison | | 37,068 | 2,764 | 7.46 | | 33,004 | 1,523 | 4.61 | |
| 61. | Marion | | 64,274 | 2,707 | 4.2 | | 67,974 | 2,241 | 3.30 | |
| 62. | Meigs | | 22,987 | 177 | .77 | | 23,641 | 206 | .87 | |
| 63. | Mercer | | 39,443 | 14 | .04 | | 38,334 | 17 | .04 | |
| 64. | Miami | | 93,182 | 1,779 | 1.91 | | 90,381 | 1,768 | 1.96 | |
| 65. | Monroe | | 15,497 | 19 | .12 | | 17,382 | 6 | .03 | |
| 66. | Morgan | | 14,194 | 570 | 4.02 | | 14,241 | 554 | 3.90 | |
| 67. | Morrow | | 27,749 | 64 | .23 | | 26,480 | 32 | .12 | |
| 68. | Muskingum | | 82,068 | 3,468 | 4.23 | | 83,340 | 3,514 | 4.22 | |
| 69. | Noble | | 11,336 | 7 | .06 | | 11,310 | 3 | .03 | |
| 70. | Ottawa | | 40,029 | 265 | .66 | | 40,076 | 245 | .61 | |
| 71. | Paulding | | 20,488 | 236 | 1.15 | | 21,302 | 238 | 1.12 | |
| 72. | Perry | | 31,557 | 57 | .18 | | 31,032 | 64 | .21 | |
| 73. | Pickaway | | 48,255 | 3,036 | 6.29 | | 43,662 | 569 | 1.30 | |
| 74. | Pike | | 24,249 | 327 | 1.35 | | 22,802 | 242 | 1.06 | |
| 75. | Preble | | 40,113 | 147 | .37 | | 38,223 | 140 | .37 | |
| 76. | Putnam | | 33,819 | 26 | .08 | | 32,991 | 22 | .07 | |
| 77. | Ross | | 69,330 | 4,467 | 6.44 | | 65,004 | 3,416 | 5.26 | |
| 78. | Sandusky | | 61,963 | 1,553 | 2.51 | | 63,267 | 1,322 | 2.09 | |
| 79. | Scioto | | 80,327 | 2,458 | 3.06 | | 84,545 | 2,389 | 2.83 | |
| 80. | Seneca | | 59,733 | 1,172 | 1.96 | | 61,901 | 1,168 | 1.89 | |
| 81. | Shelby | | 44,915 | 615 | 1.37 | | 43,089 | 503 | 1.17 | |
| 82. | Tuscarawas | | 84,090 | 623 | .74 | | 84,614 | 654 | .77 | |
| 83. | Union | | 31,969 | 1,188 | 3.72 | | 29,536 | 565 | 1.91 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 84. | Van Wert | 30,464 | 193 | .63 | 30,458 | 113 | .37 |
| 85. | Vinton | 11,098 | 4 | .04 | 11,584 | 9 | .08 |
| 86. | Washington | 62,254 | 774 | 1.24 | 64,266 | 780 | 1.21 |
| 87. | Williams | 36,956 | 23 | .06 | 36,369 | 9 | .02 |
| 88. | Wyandot | 22,254 | 20 | .09 | 22,651 | 13 | .06 |

1 Figures represent the number of districts each county is entitled to based on the ideal district population of 109,567.

2 Based on 1990 census information.

3 Based on 1990 census information.

4 Elected under the 1981 Plan.

5 Based on 1980 census information.

6 Based on 1980 census information.

7 "M/M" refers to majority minority districts. The "10%" figure represents the influence districts that do not have a sufficient minority population to constitute a majority minority district, but contain more than a 10% black population.

8 See Ohio Constitution Article XI § 10(A).

9 See Ohio Constitution Article XI § 10(B).

---

## ORDER

The majority opinion and the dissent were filed with the Clerk on Friday, January 31, 1992. The dissent made reference to Appendix 2. However, Appendix 2 was still undergoing final review and not ready for filing.

Appendix 2 is now complete and the Clerk is directed to file the same and to forward copies to counsel of record and to Judge Jones and Judge Peck.

IT IS SO ORDERED.

## APPENDIX 2

## FACT FINDINGS

### I. BACKGROUND

1. The legislative body for the State of Ohio is the General Assembly consisting of a ninety nine member House of Representatives and a thirty three member Senate.[1]

2. Section 1 of Article XI of the Ohio Constitution places the responsibility for the apportionment of the State of Ohio for the members of the General Assembly in a five person group consisting of the Governor, Auditor of State, Secretary of State, and two persons from the Ohio General Assembly, one from the House of Representatives and one from the Senate. Section 1 requires that such persons or a majority of their number shall meet and establish the boundaries for each of the ninety-nine House of Representatives districts and the thirty-three State Senate districts. The meeting is to convene on a date designated by the Governor between August 1 and October 1 in every year ending in the number one, such as 1971, 1981, 1991, etc. The apportionment is to be published by October 5 in the year in which it is made.[2]

3. The persons charged with the responsibility for the apportionment of the Ohio General Assembly in 1991 were three Republicans, Governor George Voinovich, Secretary of State Robert A. Taft, and State Senator Stanley Aronoff, and two Democrats, State Auditor Thomas Ferguson and State Representative Barney Quilter.

4. Apportionment in Ohio anticipates the use of the most recent Federal Decennial Census, if available.[3] The Court takes

1. See Article XI, Section 2 of the Ohio Constitution.

2. Section 1 of Article XI of the Ohio Constitution provides that both major political parties will be represented by two General Assembly members participating in the apportionment process. The issue of which political party controls the process is then determined by the outcome of the last state election for the office of Governor, Auditor of State and Secretary of State conducted prior to the constitutional mandate to apportion the state in every year ending in the number one. In 1990 the last such state election, Governor George Voinovich and Secretary of State Robert A. Taft, both members of the Republican party, and State Auditor Thomas Ferguson, a member of the Democratic party, were elected. Thus, the Republican party has a majority involved in the apportionment process as dictated by the Ohio Constitution.

3. See Article XI, Section 2 of the Ohio Constitution.

judicial notice that the census for Ohio in 1990 fixed the state's population at 10,847,-133. Ohio is divided into eighty-eight counties. The dominant urban counties ranked by the 1980 census are Cuyahoga (Cleveland), Franklin (Columbus), Hamilton (Cincinnati), Montgomery (Dayton), Summit (Akron), Lucas (Toledo), Stark (Canton), Butler (Middletown), Lorain (Elyria) and Mahoning (Youngstown). The 1980 and 1990 population of the eighty-eight counties are set forth on Appendix 1.

5. In preparation for the 1991 apportionment, the Ohio Legislative Task Force, a bipartisan effort, funded by the Ohio General Assembly, was established to deal with the technical issues in the 1991 apportionment including the collection and computerization of census data.[4]

6. The Ohio Legislative Task Force engaged Cleveland State University to prepare a "unified data base" for use by interested groups and the general public in the 1991 apportionment process.[5] The unified data base included PL–94171 population counts, racial demographic data and election results for all 1990 statewide races and 1990 Ohio House and Senate races. Population data was prepared by census tracts and ultimately converted to population data by wards and precincts.

All data created by Cleveland State University in the unified data base has been stipulated in this proceeding.

7. The persons responsible for the 1991 apportionment first met on August 22, 1991. Thereafter, public hearings were held at fifteen sites throughout the State of Ohio over the ensuing two and one half weeks. The purpose of the public hearings was to obtain public comment concerning the 1991 apportionment. This was the first time in Ohio history that such public apportionment hearings were held and that the public was given access to a data base and computer terminal.[6]

8. On September 26, 1991, proposed apportionment plans were submitted by: (1) the majority of persons responsible for apportionment (Governor Voinovich, Senator Aronoff and Secretary of State Taft); (2) the minority of the persons responsible for apportionment (Auditor Ferguson and Representative Quilter); (3) the Ohio Conference of Branches of the NAACP; (4) the Black Elected Democrats of Ohio (BEDO); and (5) the Ohio Republican Party.[7]

9. Defendants' Exhibit 1 is the apportionment plan submitted by the majority of persons responsible for apportionment and adopted on October 1, 1991, amended on October 3, 1991 and published by the Governor on October 5, 1991. Defendants' Exhibit 76 is the apportionment plan submitted by the Ohio Conference of Branches of the NAACP.[8] Defendants' Exhibit 77 is the plan submitted by BEDO. Defendants' Exhibit 78 is the plan submitted by Plaintiffs Ferguson and Quilter on behalf of the Ohio Democratic party. Defendants' Exhibit 79 is the plan submitted by the Ohio Republican Party.

10. The 1991 apportionment plan as adopted by the defendants Voinovich, Taft and Aronoff, as it relates to the interests of minorities and minority districts, was thoroughly discussed with minority representatives.

## II. THE APPLICATION OF THE OHIO CONSTITUTION TO THE APPORTIONMENT PROCESS

11. Article XI of the Ohio Constitution, as extensively amended in 1967 in an obvious response to the one man—one vote decision of *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), provides in

---

**4.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 23–26.

**5.** Deposition of James R. Tilling, Defendants' Exhibit 96, p. 27.

**6.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 31–33.

**7.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 34–36.

**8.** The plan of the Ohio Conference of Branches of the National Association for the Advancement of Colored People contained introductory material six pages in length and is attached as Appendix 2.

considerable detail the procedure by which the apportionment process will be accomplished.

12. Article XI, Section 10 addresses the creation and numbering of House Districts and provides:

§ 10 [Creation and numbering of house of representative districts.]

The standards prescribed in sections 3, 7, 8 and 9 of this Article shall govern the establishment of house of representative districts, which shall be created and numbered in the following order to the extent that such order is consistent with the foregoing standards:

(A) Each county containing population substantially equal to one ratio of representation in the house of representatives, as provided in section 2 of this Article, but in no event less than ninety-five per cent of the ratio nor more than one hundred five per cent of the ratio shall be designated a representative district.

(B) Each county containing population between ninety and ninety-five per cent of the ratio or between one hundred five and one hundred ten per cent of the ratio may be designated a representative district.

(C) Proceeding in succession from the largest to the smallest, each remaining county containing more than one whole ratio of representation shall be divided into house of representatives districts. *Any remaining territory within such county containing a fraction of one whole ratio of representation shall be included in one representative district by combining it with adjoining territory outside the county.*

(D) The remaining territory of the state shall be combined into representative districts.

On August 22, 1991, Mr. Tilling was designated Secretary to the persons responsible for apportionment and was directed to draft a 1991 Apportionment Plan.[9]

13. Article XI, Section 10(A) and (B) first address the creation of whole county districts, that is, a district to be created from a single county. Once those districts have been identified and established, the provisions of Article XI, Section 10(C) plug in and address the division of counties with more than one whole house ratio into districts, beginning with the largest county. Once the process has been completed with respect to counties entitled to more than one whole district, the apportionment of the remainder of the State is completed by following the provisions of Article XI, Section 10(D).[10]

Pursuant to Section 10(A) and (B), the adopted 1991 Apportionment Plan begins with the creation of seven single whole county districts.[11]

14. The Apportionment Plan, after designating the first seven single county whole districts, created house districts in successive numerical order in Cuyahoga, Franklin, Hamilton, Montgomery, Summit, Lucas, and Stark counties. Many of the urban counties had spillover into an adjoining county as required by the provisions of Article XI, Section 10(C), which requires that "... any remaining territory within such county containing a fraction of one whole ratio of representation shall be included in one representative district by combining it with adjoining territory outside the county." The provisions of Article XI, Section 10(C) prohibit the Apportionment Board from establishing more than one district in a county entitled to more than one whole district that spills over into adjoining territory. No claim is made nor

**9.** Deposition of James R. Tilling, Defendants' Exhibit 96, p. 7.

**10.** *See* fact finding # 12, *supra.*

**11.** The counties are Allen (House District 1 with a population of 109,760); Warren (House District 2 with a population of 113,915); Columbiana (House District 3 with a population of 108,-278); Wood (House District 4 with a population of 113,272); Ashtabula (House District 5 with a population of 99,821); Fairfield (House District 6 with a population of 103,453); and Wayne (House District 7 with a population of 101,441). The latter three counties were designated as single house districts pursuant to the discretionary power contained in Section 10(B).

is there any proof that the required spill-overs from the urban counties violated Section 10(C).

15. The one ratio of representation as provided in Section 2 of Article XI of the Ohio Constitution divided into the 1990 population for the urban counties is demonstrated on Appendix 1.

16. Article XI, Section 7(D) addresses the possible retention of districts established in the preceding apportionment. Article XI, Section 7(D) provides:

(D) In making a new apportionment, district boundaries established by the preceding apportionment shall be adopted *to the extent reasonably consistent* with the requirements of Section 3 of this Article. (Emphasis added)

17. Article XI, Section 3 of the Ohio Constitution describes the population requirements for house districts and states:

The population of each house of representatives district shall be substantially equal to the ratio of representation in the house of representatives, as provided in section 2 of this Article, and in no event shall any house of representatives district contain a population of less than ninety-five percent nor more than one hundred five per cent of the ratio of representation in the house of representatives, except in those instances where reasonable effort is made to avoid dividing a county in accordance with Section 9 of this Article.

18. The ratio of representation for the 1991 apportionment of the House of Representatives as determined by the formula set forth in Article XI, Section 2 is 109,567.

19. Appendix A (Defendants' Exhibit 2) is a map of the Ohio house districts as configured in the 1981 apportionment.

20. Appendix B (Defendants' Exhibit 3) is a map of the Ohio senate districts as configured in the 1981 apportionment.

21. Appendix C (Defendants' Exhibit 4) is a map of the Ohio house districts as configured in the 1991 Apportionment Plan as adopted.

22. Appendix D (Defendants' Exhibit 5) is a map of the Ohio senate districts as configured in the 1991 Apportionment Plan as adopted.

23. Appendix E (Defendants' Exhibit 6) is a colorized map showing Ohio house districts as configured in the 1991 Apportionment Plan as adopted.

24. Appendix F (Defendants' Exhibit 7) is a colorized map showing Ohio senate districts as configured in the 1991 Apportionment Plan as adopted.

25. Appendix G (Defendants' Exhibit 8) is a colorized map showing Ohio house districts as proposed by Plaintiffs' Ferguson and Quilter in the 1991 Minority Plan as proposed.

26. Appendix H (Defendants' Exhibit 9) is a colorized map showing Ohio senate districts as proposed by Plaintiffs Ferguson and Quilter in the 1991 Minority Plan as proposed.

27. Appendix I (Defendants' Exhibit 57) displays the 1981 house districts keyed to the 1990 census population. Fifty four of the 1981 districts, less the single whole county districts of Ashtabula, District 5, Fairfield County, District 6, and Wayne County, District 7, must be reconfigured because the population of the remaining fifty one districts fails to conform to the provisions of Article XI, Section 3 of the Ohio Constitution.[12]

28. Appendix J (Defendants' Exhibit 13) provides the population for each house and senate district as established in the 1991 Apportionment Plan. With the exception of H.D. 68 and S.D. 32, which will be discussed, each house and senate district complies with the population requirements of Article XI, Sections 3, 4 and 9 of the Ohio Constitution.[13]

---

**12.** Five per cent (5%) of 109,567 is 5,478. The fifty one districts in the 1981 Apportionment Plan have an upward or downward shift in population in excess of 5,478.

**13.** The defendants contend that in order to comply with other mandates of the constitution as well as the decision in the *Armour* case, it was necessary to create two undersized districts, House District 68 and Senate District 32. The question of whether those undersized districts

29. Appendix K (Defendants' Exhibit 14) provides the population of each house and senate district as proposed by Plaintiffs Ferguson and Quilter in the 1991 Minority Plan as proposed.

30. Appendix L (Defendants' Exhibit 54) displays the 1981 senate districts with 1990 census populations.

31. Appendix M (Defendants' Exhibit 55) displays the 1990 populations for 1991 senate districts as configured in the 1991 Apportionment Plan as adopted. Appendix N (Defendants' Exhibit 56) displays the same information for senate districts as proposed by Plaintiffs Ferguson and Quilter in the proposed 1991 Minority Plan.

32. The majority of the apportionment board created multiple districts from whole counties in the following order: Cuyahoga, Franklin, Hamilton, Montgomery, Summit, Lucas, Stark, Butler, Lorain and Mahoning Counties.

a) Cuyahoga County (Cleveland) consists of House Districts 8–20. House District 15 spills over into three townships of Medina County, Hinckley, Granger and Sharon. The population fluctuation among the thirteen house districts in the thirteen districts of Cuyahoga County is from the low of 104,872 to a high of 114,955.

b) Franklin County (Columbus) consists of House Districts 21–29 and part of House District 29 spills over into Pickaway County and includes Darby, Scioto, Muhlenberg, Monroe, Jackson, Perry, Deer, and Wayne Townships; parts of Harrisburg Village and New Holland Village contained in Pickaway County; and the Villages of Orient, Commercial Point, Darbyville, and Williamsport. The population fluctuation among the nine house districts of Franklin County is from a low of 104,979 to a high of 113,427.

c) Hamilton County (Cincinnati) consists of House Districts 30–37 with no spillover into adjoining counties. The population fluctuation among the eight house districts of Hamilton County is from a low of 104,424 to a high of 114,073.

d) Montgomery County (Dayton) consists of House Districts 38–43 with the only part of Montgomery County in the spillover House District 43 being Huber Heights City and the remaining portion of House District 43 is contained in part of Miami County to the north. The population fluctuation is from a low of 104,000 to a high of 111,246.

e) Summit County (Akron) consists of House Districts 44–48 with House District 48 spilling over into part of Portage County including Suffield, Rootstown, Randolph, and Atwater Townships and all of Brimfield Township, except for that part in the City of Kent, and the Village of Mogadore. The population fluctuation is from a low of 105,500 to a high of 113,164.

f) Lucas County (Toledo) consists of House Districts 49–53. House District 53 contains Oregon City, Jerusalem Township, and Harborview Village in Lucas County and the remainder of the district spills over and includes all of Ottawa County and the City of Sandusky in Erie County, and additionally, Perkins, Oxford, Groton, Margarette, and Kelley's Island Townships. The population fluctuation is from 104,395 to 113,501.

g) Stark County (Canton) consists of House Districts 54–57. The majority of House District 57 lies outside of Stark County and includes all of Carroll County, parts of Mahoning County (Youngstown) including Smith, Goshen, Berlin, Milton, Jackson, Ellsworth, Green, Beaver, and Springfield Townships, and part of Canfield Township and the City of Canfield, Sebring Village and New Middleton Village. The only parts of Stark County in House District 57 are the City of Alliance, the Village of Minerva, and Paris, Washington and Lexington Town-

---

which are below the 5% deviation limitation in the Ohio Constitution violate the Ohio Constitution is presently before the Ohio Supreme Court in a case brought by the defendants in this case

wherein they seek a declaratory judgment approving the creation of House District 68 and Senate District 32.

ships. The population fluctuation is a low of 107,746 to a high of 113,515.

h) Butler County (Middletown) consists of House Districts 58–60. House District 60 includes part of Butler County and all of Trumbull County. The population fluctuation is a low of 107,036 and a high of 113,748.

i) Lorain County (Elyria) consists of House District 61–63. House District 63 contains a part of Lorain County, Erie County and Huron County. The population fluctuation is a low of 113,457 and a high of 114,684.

j) Mahoning County (Youngstown) consists of whole House Districts 64 and 65 and the remaining part of Mahoning County spills over into House District 57 (*see* 32(g) *supra*). House Districts 64 and 65 were created in response to the *Armour* decision.

## III. THE PROCESS OF APPORTIONMENT AS FOLLOWED BY THE MAJORITY

### A. In General

33. As indicated in the 1990 census, the total population of Ohio remained at approximately 10 million people, virtually the same as in the 1980 census. Ohio experienced only a net gain of population of 50,000 people. However, there were significant population shifts within the state. Specifically, there occurred a substantial shift in population from the Northeast quadrant of the state to the Central and Southwest portions of the state, particularly to Franklin, Delaware, Union and Madison counties. There also occurred a population shift from Cincinnati and Hamilton County to Butler, Clermont and Warren counties. Cuyahoga County lost one entire house district in population (109,000 people) while Franklin County gained one entire house district. Franklin County replaced Hamilton County as the second most populous county in the state. There were also significant population shifts from the inner cities to the suburbs.[14]

34. As a result of major population shifts within counties and from the inner city to the suburbs, the vast majority of the 1981 configured districts in all major urban areas had to be reconfigured to meet the population requirements of Article XI, Section 3 of the Ohio Constitution.[15] A summary of the 1981 house districts with 1990 census population data indicating whether the 1981 district meets the requirements of Article XI, Section 3, or is too high or too low follows:[16]

### 1981 APPORTIONMENT HOUSE DISTRICTS WITH 1990 CENSUS POPULATION FOR MAJOR URBAN COUNTIES

| IDEAL HOUSE DISTRICT POPULATION—109,567 RANGE—104,089–115,045 | (Name of Black Representative Currently Serving The 1981 District) | ARTICLE XI, SECTION 3 REQUIREMENTS |
|---|---|---|
| | Cuyahoga County | |
| 6 | 113,674 | | Meets requirements |
| 7 | 107,304 | | Meets requirements |
| 8 | 100,798 | | Too low |
| 9 | 100,461 | | Too low |
| 10 | 108,686 | | Meets requirements |
| 11 | 96,086 | | Too low |
| 12 | 84,098 | (James) | Too low |
| 13 | 104,883 | | Meets requirements |
| 14 | 91,972 | (Prentiss) | Too low |

14. Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 61–63.

15. Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 79–80.

16. The source is Defendants' Exhibit 58.

| IDEAL HOUSE DISTRICT POPULATION—109,567 RANGE—104,089–115,045 | | (Name of Black Representative Currently Serving The 1981 District) | ARTICLE XI, SECTION 3 REQUIREMENTS |
|---|---|---|---|
| 15 | 99,173 | | Too low |
| 16 | 96,258 | (Whalen) | Too low |
| 17 | 107,097 | | Meets requirements |
| 18 | 101,314 | | Too low |
| 19 | 100,333 | | Too low |

### Hamilton County

| | | | |
|---|---|---|---|
| 20 | 122,802 | | Too high |
| 21 | 99,465 | | Too low |
| 22 | 108,124 | | Meets requirements |
| 23 | 97,630 | (Mallory) | Too low |
| 24 | 102,789 | | Too low |
| 25 | 99,765 | (Rankin) | Too low |
| 26 | 119,239 | | Too high |
| 27 | 116,413 | | Too high |

### Franklin County

| | | | |
|---|---|---|---|
| 28 | 116,369 | | Too high |
| 29 | 106,537 | (Miller) | Meets requirements |
| 30 | 118,913 | | Too high |
| 31 | 97,764 | (Beatty) | Too low |
| 32 | 111,070 | | Meets requirements |
| 33 | 115,186 | | Too high |
| 34 | 138,011 | | Too high |
| 35 | 157,601 | | Too high |

### Montgomery County

| | | | |
|---|---|---|---|
| 36 | 115,907 | (McLin) | Too high |
| 37 | 108,769 | (Roberts) | Meets requirements |
| 38 | 116,087 | | Too high |
| 39 | 106,321 | | Meets requirements |
| 40 | 118,434 | | Too high |

### SUMMIT COUNTY

| | | | |
|---|---|---|---|
| 41 | 107,879 | | Meets requirements |
| 42 | 105,536 | (Sykes) | Meets requirements |
| 43 | 108,031 | | Meets requirements |
| 44 | 113,743 | | Meets requirements |

### LUCAS COUNTY

| | | | |
|---|---|---|---|
| 45 | 107,825 | (Jones) | Meets requirements |
| 46 | 108,701 | | Meets requirements |
| 47 | 102,736 | | Too low |
| 48 | 121,371 | | Too high |

---

35. A summary of the statistical findings as it relates to the 1981 legislative districts as set forth in Fact Finding No. 34 in the context of the need to reconfigure as it applies to districts represented by incumbent minority (black) representatives follows:

a) Nine (9) out of the fourteen (14) districts in Cuyahoga County must be reconfigured to meet the population requirements of Article XI, Section 3. These districts are H.D. 8, 9, 11, 12, 14, 15, 16, 18 and 19. These districts include all districts represented by minority incumbents (H.D. 12 (James), 15 (Prentiss) and 16 (Whalen)). The remaining districts (H.D. 6, 7, 11, 13 and 17) cannot be retained intact given the population requirements of the other districts. Moreover, the fourteen districts must be re-

duced to thirteen districts by reason of the population loss in Cuyahoga County.

b) Seven (7) out of the eight (8) districts in Hamilton County must be reconfigured to meet the population requirements of Article XI, Section 3. These districts are H.D. 20, 21, 23, 24, 25, 26, and 27. These districts include the two districts represented by minority incumbents (H.D. 23 (Mallory) and H.D. 24 (Rankin)). The remaining district (H.D. 22) cannot be retained intact because of the population requirements of the other districts.

c) Six (6) out of the eight (8) districts in Franklin County must be reconfigured to meet the population requirements of Article XI, Section 3. These districts are H.D. 28, 30, 31, 33, 34 and 35. These districts include the district represented by minority incumbent Otto Beatty (H.D. 31). The two remaining districts cannot be retained intact because of the population requirements of the other districts.

d) Three (3) out of the five (5) districts in Montgomery County must be reconfigured to meet the population requirements of Article XI, Section 3. These districts are H.D. 36, 38 and 40. These districts include the district represented by minority incumbent McLin (H.D. 36).

The remaining districts cannot be retained intact because of the population requirements of the other districts.

e) In Summit County, all districts (H.D. 41–44) meet the population requirements of Article XI, Section 3. These districts were reconfigured to avoid splitting the black community in Summit County and to avoid minority voter dilution.

f) In Lucas County, two (2) out of four (4) districts do not meet the requirements of Article XI, Section 3. These districts are H.D. 47 and 48. The remaining districts, including H.D. 45 represented by minority incumbent Jones, cannot be retained intact because of population requirements of other districts and to avoid minority voter dilution.

36. It was necessary to reconfigure the legislative districts in the major urban counties to comply with the population requirements of Article XI, Section 3 of the Ohio Constitution.

37. The comparisons of black population by district as configured in the 1981 apportionment, the 1991 Apportionment Plan adopted by the defendants (the majority plan) and the 1991 apportionment plan as proposed by the plaintiffs Ferguson and Quilter (the 1991 minority plan) follow:

### COMPARISON OF HOUSE DISTRICTS WITH MINORITY REPRESENTATION IN 1981 DEMOCRAT PLAN 1991 MAJORITY APPORTIONMENT PLAN AND 1991 MINORITY APPORTIONMENT PLAN

| 1981 DEMOCRAT PLAN | | 1991 MAJORITY PLAN[17] | | | 1991 MINORITY PLAN | | |
|---|---|---|---|---|---|---|---|
| 6–19 Cuyahoga | | 8–20 Cuyahoga | | | 6–18 Cuyahoga | | |
| 16 – | 94.67%[18] | 10 – | 63.42%[19] | 67.35% | 12 – | 67.08% | 70.81% |
| | | 1990 Pop.—105,514 | | | | | |
| 14 – | 90.05% | 12 – | 65.13% | 67.25% | 16 – | 66.67% | 69.17% |
| | | 1990 Pop.—105,424 | | | | | |
| 12 – | 74.80% | 8 – | 61.41% | 65.64% | 14 – | 63.71% | 68.20% |
| | | 1990 Pop.—104,972 | | | | | |
| 15 – | 34.80% | 9 – | 58.36% | 62.30% | 13 – | 60.18% | 63.86% |
| | | 1990 Pop.—108,572 | | | | | |

17. In every majority-minority or black influence district with respect to the eight urban counties of Cuyahoga, Franklin, Hamilton, Montgomery, Summit, Lucas, Stark and Mahoning, the population of the district is less than the ratio of representation number of 109,567.

18. Black percentage of total population.

19. Black Voting Age Population.

## 1981 DEMOCRAT PLAN

17 – 26.14%

18 – 14.70%
19 – 14.40%
13 – 4.99%
11 – 4.44%
9 – 4.16%
7 – 2.36%
8 – 2.12%
10 – 0.64%
6 – 0.49%

### 28–35 Franklin
31 – 46.80%

29 – 38.50%

32 – 26.60%
30 – 12.40%
28 – 5.90%
34 – 5.10%
33 – 4.10%
35 – 1.40%

### 20–27 Hamilton
25 – 53.20%

23 – 45.90%

24 – 32.30%

22 – 12.60%
27 – 12.20%
20 – 8.90%
21 – 7.50%
26 – 2.70%

### 36–40 Montgomery
36 – 42.10%

37 – 36.10%

40 – 6.20%
39 – 4.70%
38 – 0.91%

### 41–44 Summit
42 – 35.40%

44 – 9.00%
43 – 2.90%
41 – 2.30%

### 45–48 Lucas
45 – 41.70%

47 – 13.20%
46 – 5.30%
48 – 2.80%

### 49–51 Stark
50 – 14.90%

49 – 4.48%
51 – 1.30%

## 1991 MAJORITY PLAN

11 – 40.61%  43.01%
1990 Pop.—105,024
14 – 6.86%  7.92%
19 – 3.71%  4.63%
15 – 3.25%  3.29%
17 – 2.34%  2.85%
13 – 2.32%  2.75%
18 – 1.31%  1.41%
16 – 0.45%  0.47%
20 – 0.23%  0.31%

### 21–29 Franklin
21 – 50.30%  55.92%
1990 Pop.—106,606
22 – 44.31%  48.29%
1990 Pop.—104,979
26 – 8.07%  8.66%
25 – 7.96%  8.41%
23 – 7.78%  8.32%
29 – 4.47%  4.32%
24 – 3.92%  4.22%
28 – 3.56%  3.75%
27 – 3.09%  3.57%

### 30–37 Hamilton
30 – 56.83%  62.07%
1990 Pop.—106,539
31 – 52.60%  59.82%
1990 Pop.—104,614
32 – 21.58%  24.00%
1990 Pop.—104,424
35 – 7.91%  8.96%
33 – 7.50%  8.04%
36 – 4.08%  4.49%
37 – 1.94%  2.14%
34 – 1.90%  2.14%

### 38–43 Montgomery
38 – 50.70%  54.78%
1990 Pop.—104,812
39 – 29.23%  32.35%
1990 Pop.—104,427
43 – 3.61%  3.86%
40 – 2.84%  3.30%
42 – 2.28%  2.76%
41 – 1.18%  1.31%

### 44–48 Summit
44 – 39.52%  43.26%
1990 .Pop.—105,500
45 – 5.40%  6.29%
47 – 5.00%  6.00%
46 – 1.12%  1.33%
48 – 0.61%  0.53%

### 49–52 Lucas
49 – 47.65%  50.92%
1990 Pop.—104,395
52 – 4.85%  5.65%
50 – 4.23%  5.46%
51 – 2.18%  2.40%

### 54–57 Stark
54 – 12.93%  15.15%
1990 Pop.—108,609
55 – 3.39%  3.84%
57 – 2.64%  2.98%
56 – 1.15%  1.20%

## 1991 MINORITY PLAN

15 – 26.46%  27.89%

11 – 7.32%  8.54%
18 – 6.03%  6.87%
9 – 5.14%  6.05%
17 – 2.97%  3.12%
7 – 2.19%  2.62%
8 – 1.16%  1.23%
10 – 0.49%  0.66%
6 – 0.44%  0.47%

### 19–26 Franklin
21 – 50.60%  53.85%

19 – 46.40%  50.80%

20 – 10.88%  12.45%
22 – 6.61%  7.04%
26 – 5.23%  5.99%
24 – 4.15%  5.08%
23 – 4.78%  4.79%
25 – 1.49%  1.62%

### 27–34 Hamilton
28 – 57.91%  61.26%

33 – 47.10%  55.49%

34 – 19.55%  21.67%

32 – 16.71%  18.46%
31 – 3.55%  4.39%
30 – 3.26%  3.96%
27 – 3.11%  3.46%
29 – 2.30%  2.53%

### 35–39 Montgomery
36 – 45.26%  47.63%

37 – 36.20%  40.79%

35 – 3.62%  4.23%
39 – 2.71%  3.21%
38 – 0.99%  1.09%

### 40–43 Summit
42 – 43.09%  47.20%

41 – 3.81%  4.25%
43 – 2.54%  2.88%
40 – 2.24%  2.54%

### 44–47 Lucas
45 – 44.98%  50.12%

46 – 4.70%  5.73%
47 – 4.16%  5.22%
44 – 3.02%  3.34%

### 48–50 Stark
50 – 12.49%  14.49%

49 – 3.43%  3.84%
48 – 3.08%  3.52%

| 1981 DEMOCRAT PLAN | | 1991 MAJORITY PLAN | | | 1991 MINORITY PLAN | | |
|---|---|---|---|---|---|---|---|
| 52–53 Mahoning | | 64–65 Mahoning | | | 55–56 Mahoning | | |
| 53 – 27.80% | | 64 – 31.19% | 35.53% | | 55 – 31.19% | 35.53% | |
| | | 1990 Pop.—106,174 | | | | | |
| 52 – 10.50% | | 65 – 1.48% | 1.64% | | 56 – 1.44% | 1.60% | |

Total (Minority Districts Over 10%)

| 24 | 16 | 16 | 18 | 18 |
|---|---|---|---|---|

Total (Minority—Majority (Over 50%))

| 4 | 8 | 9 | 6 | 9 |
|---|---|---|---|---|

38. By way of summary, the 1991 Apportionment Plan has four (4) majority-minority districts in Cuyahoga County with black voting age populations of 58.36%, 61.41%, 65.13% and 63.42%. The prior 1981 districts had only three (3) majority-minority districts with black populations of 74.80%, 90.05% and 94.67%. The 1991 Minority Plan proposed by Plaintiffs Ferguson and Quilter similarly has four majority-minority districts with black voting age populations of 60.18%, 63.71%, 66.67% and 67.08%.[20]

39. The 1991 Apportionment Plan also creates a strong influence district in Cuyahoga County of 40.61% compared to an influence district of only 26.46% in the 1991 Minority Plan proposed by Plaintiffs Ferguson and Quilter.[21]

40. The 1991 Apportionment Plan has one (1) majority-minority district in Franklin County at 50.30% black voting age population where none existed in the 1980 apportionment. The 1991 Apportionment Plan also has a strong influence district at 44.31%. By way of comparison, the 1991 Minority Plan proposed by Plaintiffs' Ferguson and Quilter also has one (1) majority-minority district at 50.60% black voting age population and one influence district at 46.40%. Significantly, part of the rationale in the 1991 Apportionment Plan for increasing relative black percentages in Franklin County house districts from the 1981 plan was to create a Senate influence district in Franklin County.[22]

41. The 1991 Apportionment Plan creates two (2) majority-minority districts in Hamilton County where only one existed in the 1981 apportionment. The majority-minority districts in the 1991 Apportionment Plan have black voting age populations of 52.60% and 56.83%. By way of comparison, the 1991 Minority Plan proposed by Plaintiffs Ferguson and Quilter also reflects one (1) majority-minority district at 57.91%. The 1991 Apportionment Plan also reflects an influence district of 21.58% compared to 19.55% in the 1991 Minority Plan proposed by Plaintiffs Ferguson and Quilter.

42. The 1991 Apportionment Plan reflects one (1) majority-minority district in Montgomery County, where none existed in the 1981 apportionment. The 1991 Apportionment Plan has a district with a black voting age population of 50.70% and an influence district at 29.23%. By way of comparison the plan presented by plaintiffs Ferguson and Quilter has no majority-minority districts and two influence districts at 36.20% and 45.26%. Plaintiffs challenge no districts in Montgomery County.

43. The 1991 Apportionment Plan reflects a slight increase in black population in House District 42, in Summit County, currently represented by minority incumbent Representative Sykes. The increase is from 35.40% to 43.26% black population. By way of comparison, the 1991 Minority Plan proposed by Plaintiffs Ferguson and Quilter also increases the black population in Representative Sykes' district from 35.40% to 47.20%. Plaintiffs challenge no districts in Summit County.

44. The 1991 Apportionment Plan reflects an increase in black population in

20. Defendants' Exhibit 77.

21. Defendants' Exhibit 77.

22. Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 103–104.

House District 45, in Lucas County, which is comparable to the district currently represented by minority incumbent Representative Casey Jones. The black voting age population in Jones' district was increased to 47.65% compared to 44.98% in the 1991 Minority Plan proposed by Plaintiffs Ferguson and Quilter. The black populations in House Districts 45 and 47 in the 1991 Apportionment Plan are substantially similar to the 1991 Apportionment Plan proposed by Plaintiffs Ferguson and Quilter.

45. In Stark County, there is not sufficient black population to form a majority-minority district.

46. The districts in Mahoning County are configured pursuant to the order of the Federal District Court in *Armour v. State of Ohio*, 775 F.Supp. 1044 (N.D.Ohio 1991).

47. Overall, there are eight (8) majority-minority districts in the 1991 Apportionment Plan compared to only four (4) in the 1981 apportionment and six (6) in the 1991 Minority Plan proposed by Plaintiffs Ferguson and Quilter.

48. Further, there is no relative reduction in the number of districts with over 10% black voting age population. In the 1991 Apportionment Plan, there are twenty (20) districts with over 10% black voting age population, precisely the same number as in the 1991 Minority Plan proposed by Plaintiffs Ferguson and Quilter. Appendix O (Defendants' Exhibit 18).

49. The 1991 Apportionment Plan doubles the number of majority-minority districts in Ohio while maintaining the same relative composition of black population in the current districts represented by minority incumbents.

50. Appendix P (Defendants' Exhibit 21) reflects the percentage change in black population in districts served by minority incumbents. Three districts in Cuyahoga County with a black population of 74.8%,

90.1% and 94.6% under the 1981 apportionment plan were reduced to 65.6%, 67.0% and 67.0% black population.

51. All eleven (11) districts currently served by minority incumbents remain strongly Democratic districts. Appendix Q (Defendants' Exhibit 59).

## IV. THE INTENTIONAL DISCRIMINATION CLAIM

### A. In General

52. Mr. Tilling was elected Secretary to the apportioning persons on August 22, 1991. Mr. Tilling was directed by the majority members of the Apportionment Board to draft a proposed Apportionment Plan.[23]

53. Mr. Tilling is Chief Executive Officer of the Ohio Senate and has been so employed since January, 1985.[24] Mr. Tilling has a B.S. degree in Social Sciences from Clarkson University, a Masters degree in political science from the University of Illinois, with a major in urban and metropolitan politics, and has completed course work toward a PhD.[25] Mr. Tilling is a former professor of political science at Ohio University where he taught from 1969 to 1976.[26]

54. In 1981, Mr. Tilling participated in a bipartisan effort to prepare the 1981 Congressional redistricting plan.[27] Mr. Tilling's testimony concerning the 1981 Congressional plan was considered by the Federal District Court in *Flanagan v. Gillmor*, 561 F.Supp. 36, 42 (S.D.Ohio, 1982), where a three judge court upheld the 1981 Congressional plan against claims of racial discrimination.

55. In 1981, Mr. Tilling observed the proposal of an Ohio Constitutional amendment to provide for fair and impartial state apportionment. The proposed amendment

---

23. Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 7–8.

24. Deposition of James R. Tilling, Defendants' Exhibit 96, p. 4.

25. Deposition of James R. Tilling, Defendants' Exhibit 96, p. 5.

26. Deposition of James R. Tilling, Defendants' Exhibit 96, p. 6.

27. Deposition of James R. Tilling, Defendants' Exhibit 96, p. 10.

was supported by the ACLU and the Council of Churches but was defeated at the polls.[28]

56. Mr. Tilling has served the last four years on the National Conference of State Legislators ("NCSL"), a bipartisan organization composed of representatives of all fifty states and designed to deal with issues of importance to state legislatures. Mr. Tilling is currently Vice–Chair of the NCSL Reapportionment Task Force.[29]

57. In his involvement with the NCSL Task Force, Mr. Tilling has chaired panels on minority voting issues under the Voting Rights Act.[30] Mr. Tilling has worked closely with Clifford Collins, Director of Voter Education of the NAACP, with James Daniels, State Chairman of the Ohio Conference of Branches of the NAACP, Frank Allison, President of the Cincinnati Branch of the NAACP, Fred Parker, President of the Columbus Branch of the NAACP, Floyd Johnson, State Coordinator for Ohio Apportionment, and other minority representatives.[31] Mr. Tilling has also participated in regional conferences, sponsored by the NAACP, regarding minority voting issues.[32] Mr. Tilling has also participated in panels, co-hosted by the United States Bureau of the Census, dealing with apportionment issues.[33]

58. On September 30, 1991, the Apportionment Board met to hear testimony from the various proponents of the proposed plans.[34]

59. On October 1, 1991, the Apportionment Board met again to consider adoption of a final plan of apportionment. The meeting was recessed from time to time to permit discussions among representatives of BEDO and the NAACP and Mr. Tilling to attempt to reach a consensus concerning minority districts.[35]

60. The above-referred discussions were initiated by Mr. Tilling after representatives of BEDO and the NAACP failed to reach a consensus regarding minority districts. Mr. Tilling contacted Congressman Stokes to attempt to bring the minority groups together. Mr. Tilling initiated these discussions since he knew that minority voting issues would be the focal point of the apportionment process.[36]

61. Floyd Johnson currently holds two offices in the NAACP. He is both the Chairman of the Political Action Committees for the Dayton Branch and the coordinator for reapportionment and redistricting for the Ohio Conference of Branches. Mr. Johnson has been associated with the NAACP for the last twenty-five years. He has held the position of chairman of the Political Action Committee for the Dayton branch for approximately five years and has held the position of Coordinator for Reapportionment and Redistricting for one year. Mr. Johnson was appointed Coordinator for Reapportionment and Redistricting for the Ohio Conference Branches of the NAACP.[37]

62. Mr. Johnson has been actively involved in minority voting issues since 1963.[38] Mr. Johnson assisted the late Representative C.J. McLin in voter registration drives encouraging minorities to register to

28. Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 10–11.

29. Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 9, 12.

30. Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 13, 14, 15, 18, 19.

31. Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 14, 15, 19.

32. Deposition of James R. Tilling, Defendants' Exhibit 96, p. 19.

33. Deposition of James R. Tilling, Defendants' Exhibit 96, p. 14.

34. Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 36–37.

35. Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 38–40.

36. Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 38, 39, 42.

37. Deposition of Floyd Johnson, Defendants' Exhibit 97, pp. 6, 7.

38. Deposition of Floyd Johnson, Defendants' Exhibit 97, p. 11.

vote.[39] Further, Mr. Johnson has been an active member of the Democratic Voters League; he was also a member of the Congress of Racial Equality in 1963, a supporter of the Nonviolent Coordinating Committee in 1963 and the Dayton Alliance for Racial Equality.[40] Additionally, Mr. Johnson has been a registered Democrat since 1960.

63. Mr. Johnson was primarily responsible for the preparation of the proposed apportionment plan submitted by the Ohio Conference of Branches of the NAACP.[41] Mr. Johnson solicited suggestions and recommendations from the Reapportionment and Redistricting Committee comprised of all of the presidents of the branches.[42] Most active among the branch presidents included Frank Allison from Cincinnati, Fred Parker from Columbus, Jesse Gooding from Dayton, and James Daniels, President of the Ohio Conference.[43] Mr. Johnson also discussed the proposed plan with Dana Mattison, the Executive Director of the Black Elected Democrats of Ohio.[44]

64. BEDO was represented in the October 1, 1991 Apportionment Hearing by Dana Mattison, its Executive Director.[45]

65. During the public hearing conducted on October 1, 1991, BEDO and the NAACP reached a consensus regarding the establishment of minority districts in Cuyahoga County in the final 1991 apportionment plan. The NAACP accepted BEDO's proposal for Cuyahoga County, establishing four majority-minority districts and one influence district in Cleveland. The NAACP's original plan established five majority-minority districts in Cuyahoga County. The plan originally submitted by the Board also called for five majority-minority districts in Cuyahoga County.[46]

66. On October 1, 1991, BEDO offered the consensus position with regard to the districts in Cuyahoga County as an amendment to the BEDO plan (referred to herein as the "BEDO Amendment"). The BEDO Amendment was also offered as an amendment to the plan proposed by the majority of persons responsible for apportionment.[47] The amendment was accepted by the Apportionment Board and incorporated in the final 1991 Apportionment Plan.[48]

67. At the meeting of October 1, 1991, Dana Mattison and Senator Jeff Johnson, a minority Senator from Cuyahoga County, endorsed the BEDO Amendment creating four majority-minority districts. Floyd Johnson, on behalf of the NAACP, endorsed the entire 1991 Apportionment Plan.[49]

68. The BEDO Amendment was endorsed by William Mallory, President of BEDO and Congressman Stokes.[50] Appendix R (Defendants' Exhibit 24) is a letter from William Mallory to James Tilling dated October 1, 1991, confirming BEDO's support for the BEDO Amendment.[51]

69. The Ohio Conference of Branches of the NAACP endorsed the 1991 Apportion-

---

**39.** Deposition of Floyd Johnson, Defendants' Exhibit 97, p. 11.

**40.** Deposition of Floyd Johnson, Defendants' Exhibit 97, p. 12.

**41.** Deposition of Floyd Johnson, Defendants' Exhibit 97, p. 18.

**42.** Deposition of Floyd Johnson, Defendants' Exhibit 97, pp. 16, 19.

**43.** Deposition of Floyd Johnson, Defendants' Exhibit 97, p. 16.

**44.** Deposition of Floyd Johnson, Defendants' Exhibit 97, p. 19.

**45.** Deposition of Dana Mattison, Defendants' Exhibit 82, sub exhibit C; p. 14.

**46.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 40, 43.

**47.** Deposition of James R. Tilling, Defendants' Exhibit 96, p. 41.

**48.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 40, 44.

**49.** Deposition of James R. Tilling, Defendants' Exhibit 96, p. 40; Deposition of Dana Mattison, Defendants' Exhibit 82, pp. 83–89; Deposition of Floyd Johnson, Defendants' Exhibit 97, p. 58.

**50.** Deposition of Dana Mattison, Defendants' Exhibit 82, pp. 89, 90, 91.

**51.** Deposition of James R. Tilling, Defendants' Exhibit 96, p. 116.

ment Plan in its entirety.[52]

B. As to the Apportionment of Specific Counties.

70. As discussed above, BEDO and the NAACP both endorsed the 1991 Apportionment Plan as respects Cuyahoga County. BEDO Executive Director Dana Mattison supported the 1991 Apportionment Plan for Cuyahoga County given racial bloc voting in the county, the major population drifts from the inner city to the suburbs of Cleveland and low minority voter turnout in Cleveland.[53]

71. BEDO specifically recommended an *increase* from the 1981 plan in black population percentages in the two districts in Franklin County currently represented by Representatives Miller and Beatty to avoid minority vote dilution under the Voting Rights Act. Mr. Mattison testified:

Q. So you increased Ray Miller's district more than the majority did in adopting the '91 plan?

A. In this particular case.

Q. Well, tell me generally why you went from 38 to 50 percent in Ray Miller's district?

A. Well again we looked at the totality of circumstances, looked at a number of issues and came to the conclusion that these were the figures necessary again to comply with our understanding of the Voting Rights Act.[54]

72. BEDO supported an *increase* in black population in both districts represented by minority incumbents, Representatives Mallory and Rankin, even though these incumbents have been elected over the years.

Q. Now going back to Hamilton County just briefly, for a second, same situation. Rankin and Mallory have been representatives elected over a long period of time and yet you increased the percentage of black population.

A. Uh-hum.

Q. Why is that?

A. Again, this is an individual district by district examination. We believe that communities respond differently based on a whole range of circumstances. Again, understand that Representative Rankin came to that district after her husband passed away, and there is a long-standing relationship with voters, but that does not mean that the trends indicate that that's going to continue over time, *and what we tried not to do was to construct districts based on incumbents. That's just not the reasonable thing to do.* (Emphasis added.)[55]

73. In Montgomery County House District 36 as established by the 1981 Apportionment Plan now exceeds the population requirements of Article XI, Section 3 of the Ohio Constitution. However, blacks are migrating from Representative McLin's district to Representative Robert's district so that, over time, McLin's district will lose black population and Robert's district will gain black population. Mr. Tilling recognized this population drift in his configuration of districts in Montgomery County.[56]

74. Both BEDO and Plaintiffs Ferguson and Quilter also recognized these population shifts in configuring districts in Montgomery County in their respective plans.[57]

75. Floyd Johnson, representing the NAACP, endorsed the 1991 Apportionment Plan as respects the configuration of all the minority districts in the 1991 Apportionment Plan, specifically those minority districts in Montgomery County. Mr. Johnson acknowledged that population shifts in Montgomery County required increases in black population in Representative McLin's

52. Deposition of Floyd Johnson, Defendants' Exhibit 97, pp. 57–59.

53. Deposition of Dana Mattison, Defendants' Exhibit 82, pp. 14–16, 89–92; Deposition of Floyd Johnson, Defendants' Exhibit 97, p. 58.

54. Deposition of Dana Mattison, Defendants' Exhibit 98, p. 58.

55. Deposition of Dana Mattison, Defendants' Exhibit 98, p. 72.

56. Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 87–88.

57. Deposition of Dana Mattison, Defendants' Exhibit 98, p. 70.

district in order to maintain McLin's district as a minority district. Further, with the construction of the Trotwood corridor in the construction of Highway 35, black population would be displaced from Representative McLin's district.[58]

76. Mr. Tilling recommended an increase in the black population in Representative Sykes' district in Summit County to avoid minority voter dilution since the district is losing black population.[59] This recommendation was endorsed by Floyd Johnson for the NAACP.[60] BEDO also recommended an increase in the percentage of the black population in Sykes' district from 35% to 52% based on the same analysis.[61]

77. BEDO's plan increased the black population in Representative Jones' district in Lucas County due to population shifts in the district and because an expansion of the University of Toledo will displace black population.[62] Mr. Tilling employed the same rationale to the configuration of this district in Lucas County in the 1991 Apportionment Plan.[63]

78. Both BEDO and NAACP recognize that increasing the black population in certain districts will result in a marginal reduction in black population in other districts. It is not possible to increase the minority population of some districts without reducing it in others. Dana Mattison, for example, testified:

Q. Why didn't BEDO maintain minority districts as they were in 1980 with a spread of black population of 12.20% up to 53% as opposed to creating two districts at 47 and 57 percent [in Hamilton County] and taking black population from the remaining districts?

A. Well, primarily because of our understanding of totality of circumstances much of which was new to the political arena vis-a-vis the 1982 amendment to the Voting Rights Act that wasn't present in 1980, and based on our assessment these were the numbers that were required to comport with our understanding of the requirements.

Q. But the effect of doing that, Mr. Mattison, is to reduce the black population in the remaining districts in Hamilton County?

A. That's what happens when you've got too few African–Americans in a district based again on totality of circumstances and they got to come from somewhere.[64]

## V. TOTALITY OF CIRCUMSTANCES

### A. Geographical Cohesion of Minority Communities

82. Significant minority populations in all major urban counties are geographically compact and contiguous.[65]

83. The districts created in the 1991 Apportionment Plan are geographically compact and contiguous.[66]

### B. Political Cohesion

84. All minority districts in the 1991 Apportionment Plan are politically cohesive. Blacks tend to vote for democratic candidates by a substantial majority.[67]

---

**58.** Deposition of Floyd Johnson, Defendants' Exhibit 97, pp. 46–48.

**59.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 88–89.

**60.** Deposition of Floyd Johnson, Defendants' Exhibit 97, p. 50.

**61.** Deposition of Dana Mattison, Defendants' Exhibit 98, p. 75.

**62.** Deposition of Dana Mattison, Defendants' Exhibit 98, pp. 80–81.

**63.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 89–90.

**64.** Deposition of Dana Mattison, Defendants' Exhibit 98, pp. 56–57.

**65.** Defendants' Exhibits 26, 30, 34, 38, 42, 46, and 50; Deposition of James Tilling, Defendants' Exhibit 96, pp. 63–77.

**66.** Defendants' Exhibits 27–29 (Cuyahoga), 31–33 (Franklin), 35–37 (Hamilton), 39–41 (Montgomery), 43–45 (Summit), 47–49 (Lucas) and 51–53 (Mahoning); Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 63–77.

**67.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 64–66.

## C. Racial Bloc Voting

85. In preparing the 1991 Apportionment Plan, Mr. Tilling considered election returns for house and senate and statewide races from 1982 through 1990. He also considered the Jesse Jackson primary campaign for President. Mr. Tilling did a precinct-by-precinct review and found significant evidence of racial bloc voting statewide.[68]

86. Defendants' expert, Dr. Gary King, is Professor of Government at Harvard University and is Director of the Harvard Data Center. Dr. King is a political scientist and statistician, specializing in quantitative methods and application of quantitative methods to redistricting. Dr. King received his Ph.D. from the University of Wisconsin in 1984. Dr. King has published extensively in the area of apportionment. Dr. King has received numerous grants and awards in his area of expertise. Dr. King is an editorial board member of several scholarly journals published in his area of expertise. Dr. King has lectured extensively in the area of political science and apportionment.[69]

87. Dr. King analyzed over 200 elections in Ohio from 1982 through 1990. Dr. King conducted a bivariate ecological regression analysis and determined that *all* the data indicated significant racially polarized voting.[70]

88. Dr. King verified the results of his bivariate ecological regression analysis by conducting a homogeneous precinct analysis and an analysis based on an aggregated compound multinomial model. These analyses confirmed the results of the bivariate ecological regression analysis.[71]

89. There exists evidence of a history of official discrimination in the State of Ohio and local political subdivisions that touched the rights of minorities to participate in the democratic process. This evidence includes:

a) The 1981 apportionment plan was held to unlawfully dilute minority voting strength in *Armour v. State of Ohio*, 775 F.Supp. 1090 (1991);

b) In *Mallory v. Eyrich*, 922 F.2d 1273 (6th Cir.1991), the Governor, Secretary of State, and Members of the Hamilton County Board of Elections conceded that the at-large election of Hamilton County Municipal Court Judges unlawfully diluted minority voting strength under S2 of the Voting Rights Act;

c) The 1991 apportionment plan resulted in only four (4) majority-minority districts in Ohio, three (3) of which were in Cuyahoga County;[72]

d) Until 1991, when the Republicans constituted a majority of persons responsible for apportionment, minorities did not effectively participate in the state apportionment process;[73]

e) No minority candidate has ever been elected to a partisan statewide office in Ohio,[74] but a minority candidate, Robert Duncan, was elected to the Ohio Supreme Court several decades earlier. Candidates for judicial office in Ohio run in a partisan primary, but on a non-partisan ballot in the general election.

f) There is governmental discrimination based on governmental apathy to the interests of the black community.[75]

g) Many public witnesses in the public hearings urged the persons responsible for apportionment to maintain and enhance majority-minority and influence

---

68. Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 91–93.

69. Deposition of Dr. Gary King, Defendants' Exhibit 95, pp. 5–6; Curriculum Vitae of Dr. Gary King, Defendants' Exhibit 85.

70. Deposition of Dr. Gary King, Defendants' Exhibit 95, p. 40; Defendants' Exhibits 91 and 93.

71. Deposition of Dr. Gary King, Defendants' Exhibit 95, p. 44.

72. Defendants' Exhibit 17.

73. Deposition of Dana Mattison, Defendants' Exhibit 82, p. 95.

74. Deposition of Dana Mattison, Defendants' Exhibit 82, p. 41.

75. Deposition of Dana Mattison, Defendants' Exhibit 82, p. 31.

districts throughout the state. These witnesses included:

1. James Mitchell, Black Elected Suburban Officials (August 28, 1991, p. 24);

2. Dana Mattison, Executive Director of the Black Elected Democrats of Ohio (BEDO), (August 29, 1991, p. 37);

3. Dr. Gordon Welty, Wright State University (August 29, 1991, p. 20);

4. Jerry Hammond, former President of Columbus City Council (September 7, 1991, pp. 48–49);

5. Samuel Gresham, Columbus Urban League (September 7, 1991, p. 61);

6. Mark Bradley, People's Coalition For Voter Participation (September 7, 1991, p. 61);

7. Wayne West, Young Black Democrats (September 7, 1991, p. 67);

8. Cathy Mock, President, Young Black Democrats (September 7, 1991, p. 109).

h) Both the NAACP and BEDO have taken the position that the persons responsible for apportionment must create majority-minority districts wherever possible and must maintain and enhance existing minority districts.[76]

90. There exists significant racially polarized voting throughout the State of Ohio.[77]

91. Minorities have experienced racial barriers to effective participation in the democratic process in Ohio. Examples include:

a) There is no consistent system of open primaries in the Democratic party. Endorsements and screening processes present barriers to minority candidates;[78]

b) Minorities receive no significant financial support from the State Democratic Party;[79]

c) "Electability" of blacks present further barriers to effective participation of blacks in primaries;[80]

d) Campaign financing and party endorsement pose effective racial barriers to black participation in the Democratic primary system.[81]

92. Minorities in Ohio bear the effects of discrimination in education, employment, and health which hinder their ability to participate effectively in the political process.

a) Blacks experience a significantly higher unemployment rate in Ohio and significantly less opportunity for professional employment. This occurs throughout the state and every major urban area in Ohio. Specifically, in 1990, the unemployment rate for white males was 4.6% but 16.6% for black males. Total unemployment for whites was 4.6% but 14.2% for blacks. Unemployment for whites, ages 16 to 19, was 11.6% but 40.4% for blacks, ages 16 to 19. The unemployment rate for blacks was 13.6% in Cincinnati, 17.3% in Cleveland, 6.8% in Columbus and 10.6% in Dayton—all significantly higher than whites. Similar statistics apply in 1988 and 1989;[82]

b) Minority voter turnout in Cleveland is extremely low due to minority frustration and apathy;[83]

c) The geographical displays of minority population concentrations indicate past

---

**76.** Deposition of Dana Mattison, Defendants' Exhibit 82, p. 47; Deposition of Floyd Johnson, Defendants' Exhibit 97, pp. 42–50.

**77.** Deposition of Dr. Gary King, Defendants' Exhibit 95, p. 45.

**78.** Deposition of Dana Mattison, Defendants' Exhibit 82, pp. 25–27.

**79.** Deposition of Dana Mattison, Defendants' Exhibit 82, p. 28.

**80.** Deposition of Dana Mattison, Defendants' Exhibit 82, p. 29.

**81.** Deposition of Floyd Johnson, Defendants' Exhibit 97, pp. 23, 34.

**82.** Defendants' Exhibits 64, 65 and 66; Deposition of James R. Tilling, Defendants' Exhibit 96, p. 97. *See also,* Deposition of Floyd Johnson, Defendants' Exhibit 97, p. 36.

**83.** Deposition of Dana Mattison, Defendants' Exhibit 82, p. 52.

discrimination in housing; [84]

d) Blacks are less mobile and less able to obtain housing due to past housing discrimination practices; [85]

e) There are numerous reported cases in Ohio and in the Sixth Circuit finding minority discrimination in police and fire departments, in education, in housing, in elections, in state contracting, in employment and in zoning practices; [86]

f) School systems operate under desegregation orders in major urban areas in Ohio; [87]

g) As indicated by Mr. Tilling's participation on the Joint Select Committee on School Desegregation in the General Assembly (unanimously supported by Republicans), the effects of school desegregation in education in Ohio persist; [88]

h) The school system in Dayton and the police department are subject to desegregation orders; [89]

i) In 1981, the Democrats effectively precluded minority Senator Morris Jackson's participation in drawing district lines; [90]

j) In the early 1980's, Democrats foreclosed Senator Jackson's participation as a delegate to the Democratic National Convention.[91]

93. Political campaigns in Ohio have been characterized by overt or subtle racial appeal.

a) There is a recognition in state Democratic politics that people do not vote for blacks solely because of their race; [92]

b) Racial appeals exist in political campaigns as evidenced by prominent pictures of black candidates to reinforce the perception that the candidate is black; [93]

c) Opponents in campaigns raise the issue of "welfare" whenever a black candidate runs for office; [94]

d) Racial appeals exist in local races in Montgomery County. Higher voter turnout occurs when a black candidate runs for office; [95]

e) In 1980, Floyd Johnson ran against Ed Orlett, the endorsed candidate, in a primary for a house seat in Montgomery County. Mr. Johnson received virtually all of the black vote and insufficient white vote to gain the seat; [96]

f) Race plays a key role in politics in Central Ohio. Former President of City Council Jerry Hammond cited the Frances–Lashutka race for Columbus' City Attorney and the Moody–Rosemond races for Mayor; [97]

g) James Tilling, based on his experience in the Senate campaigns, testified that subtle or overt racial appeals have been made in numerous elections, citing the Forbes–Bonnano race in Cuya-

**84.** Defendants' Exhibits 26, 30, 34, 38, 42, 46 and 50.

**85.** Deposition of Dana Mattison, Defendants' Exhibit 82, p. 37.

**86.** Defendants' Exhibit 66.

**87.** Defendants' Exhibit 66.

**88.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 96, 97.

**89.** Deposition of Floyd Johnson, Defendants' Exhibit 97, p. 34.

**90.** Deposition of James R. Tilling, Defendants' Exhibit 96, p. 98.

**91.** Deposition of James R. Tilling, Defendants' Exhibit 96, p. 98.

**92.** Deposition of Dana Mattison, Defendants' Exhibit 82, p. 32.

**93.** Deposition of Dana Mattison, Defendants' Exhibit 82, pp. 65–66.

**94.** Deposition of Dana Mattison, Defendants' Exhibit 82, pp. 65–66.

**95.** Deposition of Floyd Johnson, Defendants' Exhibit 97, p. 23.

**96.** Deposition of Floyd Johnson, Defendants' Exhibit 97, pp. 11, 29.

**97.** Testimony of Jerry Hammond, September 7, 1991, pp. 48–49.

hoga County, the C.J. Thomas–Ike Thompson race, Virgil Browns' race for Secretary of State, Carl Stokes' race for Mayor in Cleveland, the Lashutka–Francis race for Columbus City Attorney, the Moody–Francis race for Columbus Mayor and the Lashutka–Esp race for Columbus Mayor.[98]

## E. Roll Call Analysis

94. Defendants' Exhibit 62 is a roll call analysis prepared by James R. Tilling. The analysis indicates strong Republican support for bills of interest to minorities. Absent Republican support in the Senate, the bills would never have been passed.[99]

## VI. PARTISAN BIAS

95. Dr. Gary King, Defendants' expert, conducted an analysis of the partisan bias in the 1991 apportionment plan, Apportionment Plan (the "Tilling Plan"), the 1991 Democrats' Plan and the 1991 plan submitted by the Ohio Republican Party.[100]

96. Dr. King performed this analysis based on district and precinct level data for Ohio House and Senate elections.[101]

97. Dr. King conducted the analysis of partisan bias by use of a seats/vote curve, a methodology standardly accepted in the field for over 100 years.[102]

98. Partisan bias is measured by partisan symmetry. Partisan symmetry provides that political parties are treated fairly in the electoral system if votes are symmetrical to the number of seats awarded in an election.[103]

99. The seats/votes curve methodology is a regression methodology. Dr. King conducted a regression analysis and then calculated the variance around the seats/votes curve with standard deviations.[104]

100. The analysis of the 1971 and 1981 apportionment plans prepared by the Democrats in prior apportionments for the Ohio House indicates that the 1971 and 1981 apportionment plans were heavily biased in favor of the Democrats.[105]

101. The 1971 apportionment prepared by the Democrats has been characterized as the most partisan plan ever recorded in the political science literature. The 1981 apportionment plan prepared by the Democrats is also significantly biased in favor of the Democrats.[106]

102. Dr. King's analysis of the four plans in question for the Ohio House indicates that both the 1981 apportionment plan and the 1991 plan proposed by Plaintiffs Ferguson and Quilter are heavily biased in favor of the Democrats. The 1991 plan offered by the Ohio Republican Party is biased in favor of the Republicans. However, the 1991 Apportionment Plan (the "Tilling Plan") is not biased in favor of any political party.[107]

103. The results of Dr. King's analysis indicates that the 1991 Apportionment Plan reflects an average partisan bias of only −0.006, less than the standard error of .011.[108]

**98.** Deposition of James Tilling, November 20, 1991, pp. 195–198.

**99.** Deposition of James R. Tilling, Defendants' Exhibit 96, pp. 114–126.

**100.** Deposition of Dr. Gary King, Defendants' Exhibit 95, pp. 14, 27, 32–38.

**101.** Deposition of Dr. Gary King, Defendants' Exhibit 95, p. 7.

**102.** Deposition of Dr. Gary King, Defendants' Exhibit 95, pp. 13–14.

**103.** Deposition of Dr. Gary King, Defendants' Exhibit 95, p. 16.

**104.** Deposition of Dr. Gary King, Defendants' Exhibit 95, pp. 20–21.

**105.** Deposition of Dr. Gary King, Defendants' Exhibit 95, pp. 28–30; Defendants' Exhibit 88.

**106.** Deposition of Dr. Gary King, Defendants' Exhibit 95, pp. 7, 9.

**107.** Deposition of Dr. Gary King, Defendants' Exhibit 95, pp. 33–34; Defendants' Exhibit 90.

**108.** Deposition of Dr. Gary King, Defendants' Exhibit 95, p. 35.

104. Dr. King's analysis of the plans for the Ohio Senate indicate that the 1981 Apportionment Plan cannot be statistically distinguished from zero partisan bias.[109]

105. The results of Dr. King's regression analysis indicates that the 1991 Apportionment Plan is statistically indistinguishable from zero partisan bias for both the Ohio House and Senate and consequently is not a partisan gerrymandered plan.[110]

**109.** Deposition of Dr. Gary King, Defendants' Exhibit 95, p. 37; Defendants Exhibit 91.

**110.** Deposition of Dr. Gary King, Defendants' Exhibit 95, pp. 34, 37.

## APPENDIX A
### 1981 OHIO HOUSE DISTRICTS

# APPENDIX B
## 1981 OHIO SENATE DISTRICTS

DEFENDANT'S EXHIBIT
3

## APPENDIX C
### 1991 APPORTIONMENT MAJORITY
### NEW HOUSE DISTRICTS
### FOR OHIO GENERAL ASSEMBLY

DEFENDANT'S EXHIBIT

## APPENDIX D
### 1991 APPORTIONMENT MAJORITY
### NEW SENATE DISTRICTS
### FOR OHIO GENERAL ASSEMBLY

APPENDIX E

1991 MAJORITY APPORTIONMENT
HOUSE DISTRICTS

DEFENDANT'S
EXHIBIT

6

# APPENDIX F

## 1991 MAJORITY APPORTIONMENT
## SENATE DISTRICTS

DEFENDANT'S
EXHIBIT
7

APPENDIX G

1991 MINORITY APPORTIONMENT
HOUSE DISTRICTS

DEFENDANT'S
EXHIBIT

# APPENDIX H

## 1991 MINORITY APPORTIONMENT SENATE DISTRICTS

## APPENDIX I
### 1981 APPORTIONMENT HOUSE DISTRICTS
### WITH 1990 POPULATION

| DISTRICT | POPULATION | DEVIATION | | PERCENT BLACK | PERCENT BLACK VAP |
|---|---|---|---|---|---|
| 01 | 109755 | 188 | | 11.22 | 10.07 |
| 02 | 99821 | −9746 | * | 3.14 | 2.81 |
| 03 | 108276 | −1291 | | 1.30 | 1.23 |
| 04 | 122354 | 12787 | * | 0.69 | 0.65 |
| 05 | 113269 | 3702 | | 1.03 | 1.10 |
| 06 | 113674 | 4107 | | 0.47 | 0.44 |
| 07 | 107304 | −2263 | | 2.41 | 2.00 |
| 08 | 100798 | −8769 | * | 2.19 | 1.91 |
| 09 | 100461 | −9106 | * | 4.28 | 3.59 |
| 10 | 108686 | −881 | | 0.62 | 0.51 |
| 11 | 96086 | −13481 | * | 4.67 | 3.54 |
| 12 | 84098 | −25469 | * | 75.25 | 71.63 |
| 13 | 104883 | −4684 | | 5.00 | 4.39 |
| 14 | 91972 | −17595 | * | 90.39 | 88.45 |
| 15 | 99173 | −10394 | * | 35.14 | 31.56 |
| 16 | 96258 | −13309 | * | 94.92 | 94.23 |
| 17 | 107097 | −2470 | | 26.14 | 24.45 |
| 18 | 101314 | −8253 | * | 14.83 | 13.88 |
| 19 | 100333 | −9234 | * | 14.45 | 12.89 |
| 20 | 122802 | 13235 | * | 8.93 | 6.72 |
| 21 | 99465 | −10102 | * | 7.53 | 5.85 |
| 22 | 108124 | −1443 | | 12.67 | 11.27 |
| 23 | 97630 | −11937 | * | 46.07 | 39.78 |
| 24 | 102789 | −6778 | * | 32.37 | 29.20 |
| 25 | 99765 | −9802 | * | 53.34 | 49.58 |
| 26 | 119239 | 9672 | * | 2.73 | 2.46 |
| 27 | 116413 | 6846 | * | 12.26 | 10.82 |
| 28 | 116369 | 6802 | * | 5.95 | 5.24 |
| 29 | 106537 | −3030 | | 38.73 | 35.00 |
| 30 | 118913 | 9346 | * | 12.50 | 10.83 |
| 31 | 97764 | −11803 | * | 46.98 | 42.49 |
| 32 | 111070 | 1503 | | 26.76 | 25.19 |
| 33 | 115186 | 5619 | | 4.16 | 3.55 |
| 34 | 138011 | 28444 | * | 5.12 | 4.81 |
| 35 | 157601 | 48034 | * | 1.45 | 1.37 |
| 36 | 115907 | 6340 | * | 42.20 | 39.75 |
| 37 | 108769 | −798 | | 36.29 | 32.76 |
| 38 | 116087 | 6520 | * | 0.92 | 0.83 |
| 39 | 106321 | −3246 | | 4.71 | 3.65 |
| 40 | 118434 | 8867 | * | 6.22 | 5.57 |
| 41 | 107879 | −1688 | | 2.32 | 1.97 |
| 42 | 105536 | −4031 | | 35.53 | 32.01 |
| 43 | 108031 | −1536 | | 2.87 | 2.52 |
| 44 | 113743 | 4176 | | 9.05 | 8.11 |
| 45 | 107825 | −1742 | | 41.95 | 37.61 |
| 46 | 108701 | −866 | | 5.37 | 4.45 |
| 47 | 102736 | −6831 | * | 13.41 | 11.36 |
| 48 | 121371 | 11804 | * | 2.80 | 2.58 |
| 49 | 107339 | −2228 | | 4.46 | 3.98 |
| 50 | 104311 | −5256 | * | 14.98 | 12.93 |
| 51 | 116672 | 7105 | * | 1.31 | 1.17 |
| 52 | 102329 | −7238 | * | 10.66 | 9.52 |
| 53 | 98900 | −10667 | * | 28.05 | 23.94 |
| 54 | 104411 | −5156 | | 7.73 | 6.77 |
| 55 | 99153 | −10414 | * | 10.31 | 8.79 |
| 56 | 122892 | 13325 | * | 4.80 | 4.25 |
| 57 | 132647 | 23080 | * | 4.74 | 4.39 |
| 58 | 98904 | −10663 | * | 2.37 | 2.32 |
| 59 | 97194 | −12373 | * | 12.87 | 11.15 |
| 60 | 102963 | −6604 | * | 1.04 | 1.01 |

| DISTRICT | POPULATION | DEVIATION | | PERCENT BLACK | PERCENT BLACK VAP |
|---|---|---|---|---|---|
| 61 | 112536 | 2969 | | 2.18 | 1.98 |
| 62 | 110506 | 939 | | 11.41 | 10.46 |
| 63 | 116110 | 6543 | * | 3.20 | 3.02 |
| 64 | 97795 | −11772 | * | 9.98 | 9.45 |
| 65 | 111280 | 1713 | | 8.33 | 8.66 |
| 66 | 125986 | 16419 | * | 0.93 | 0.86 |
| 67 | 109365 | −202 | | 1.68 | 1.58 |
| 68 | 113941 | 4374 | | 1.57 | 1.43 |
| 69 | 106276 | −3291 | | 7.51 | 5.94 |
| 70 | 102238 | −7329 | * | 6.05 | 5.19 |
| 71 | 102840 | −6727 | * | 4.02 | 3.55 |
| 72 | 103861 | −5706 | * | 3.40 | 3.47 |
| 73 | 117203 | 7636 | * | 1.08 | 1.14 |
| 74 | 112844 | 3277 | | 1.26 | 1.21 |
| 75 | 112214 | 2647 | | 1.88 | 1.84 |
| 76 | 112125 | 2558 | | 0.92 | 0.82 |
| 77 | 120266 | 10699 | * | 1.06 | 1.02 |
| 78 | 122386 | 12819 | * | 1.25 | 1.39 |
| 79 | 114804 | 5237 | | 0.53 | 0.49 |
| 80 | 113879 | 4312 | | 0.53 | 0.41 |
| 81 | 110715 | 1148 | | 0.60 | 0.57 |
| 82 | 114875 | 5308 | | 0.75 | 0.71 |
| 83 | 115397 | 5830 | * | 3.95 | 4.41 |
| 84 | 127068 | 17501 | * | 1.92 | 2.33 |
| 85 | 106082 | −3485 | | 2.55 | 2.20 |
| 86 | 102142 | −7425 | * | 2.68 | 2.88 |
| 87 | 126643 | 17076 | * | 2.10 | 2.22 |
| 88 | 117585 | 8018 | * | 6.38 | 7.65 |
| 89 | 104576 | −4991 | | 2.66 | 2.98 |
| 90 | 104110 | −5457 | * | 0.82 | 0.75 |
| 91 | 107881 | −1686 | | 3.19 | 2.96 |
| 92 | 103162 | −6405 | * | 1.73 | 1.65 |
| 93 | 112658 | 3091 | | 1.41 | 1.29 |
| 94 | 113490 | 3923 | | 2.40 | 2.45 |
| 95 | 107300 | −2267 | | 1.01 | 1.00 |
| 96 | 107725 | −1842 | | 1.54 | 1.48 |
| 97 | 110611 | 1044 | | 0.69 | 0.66 |
| 98 | 96383 | −13184 | * | 5.06 | 4.60 |
| 99 | 97907 | −11660 | * | 1.36 | 1.26 |

## APPENDIX J
### District Report for Plan 'planrepo' House
### Wed Dec 4 11:09:37 1991

Target Population = 0

| District | Persons | %Black | %Black VAP | % Hisp | % Hisp VAP |
|---|---|---|---|---|---|
| 01 | 109755 | 11.22 | 10.07 | 1.13 | 1.00 |
| 02 | 113908 | 2.12 | 2.56 | 0.46 | 0.42 |
| 03 | 108275 | 1.30 | 1.23 | 0.37 | 0.30 |
| 04 | 113269 | 1.03 | 1.10 | 2.54 | 2.07 |
| 05 | 99821 | 3.14 | 2.81 | 1.54 | 1.19 |
| 06 | 103451 | 1.11 | 1.30 | 0.47 | 0.41 |
| 07 | 101441 | 1.53 | 1.40 | 0.42 | 0.35 |
| 08 | 104972 | 65.64 | 61.41 | 0.73 | 0.70 |
| 09 | 108572 | 62.30 | 58.36 | 0.86 | 0.84 |
| 10 | 105514 | 67.35 | 63.42 | 3.01 | 2.69 |
| 11 | 104799 | 43.01 | 40.61 | 0.92 | 0.83 |
| 12 | 105423 | 67.25 | 65.13 | 0.58 | 0.51 |
| 13 | 114859 | 2.85 | 2.32 | 10.95 | 8.82 |
| 14 | 112432 | 7.92 | 6.86 | 0.69 | 0.64 |
| 15 | 109713 | 3.29 | 3.25 | 0.65 | 0.60 |
| 16 | 106959 | 0.47 | 0.45 | 0.93 | 0.80 |
| 17 | 114174 | 2.75 | 2.34 | 4.96 | 3.93 |

| District | Persons | %Black | %Black VAP | % Hisp | % Hisp VAP |
|---|---|---|---|---|---|
| 18 | 108566 | 1.41 | 1.31 | 1.01 | 0.86 |
| 19 | 114955 | 4.63 | 3.71 | 2.10 | 1.76 |
| 20 | 113210 | 0.31 | 0.23 | 0.73 | 0.65 |
| 21 | 106606 | 55.92 | 50.30 | 1.04 | 1.02 |
| 22 | 104981 | 48.29 | 44.31 | 0.90 | 0.82 |
| 23 | 113429 | 8.32 | 7.78 | 0.97 | 0.98 |
| 24 | 108120 | 4.22 | 3.92 | 0.82 | 0.73 |
| 25 | 110612 | 8.41 | 7.96 | 0.93 | 0.87 |
| 26 | 105961 | 8.66 | 8.07 | 1.16 | 1.07 |
| 27 | 107162 | 3.57 | 3.09 | 0.97 | 0.90 |
| 28 | 111463 | 4.32 | 3.56 | 0.97 | 0.90 |
| 29 | 110026 | 3.75 | 4.47 | 0.92 | 0.92 |
| 30 | 106538 | 61.07 | 56.83 | 0.75 | 0.75 |
| 31 | 104614 | 59.82 | 52.60 | 0.64 | 0.65 |
| 32 | 104424 | 24.00 | 21.58 | 0.71 | 0.64 |
| 33 | 114073 | 8.04 | 7.50 | 0.52 | 0.50 |
| 34 | 104898 | 2.14 | 1.90 | 0.38 | 0.31 |
| 35 | 107202 | 8.96 | 7.91 | 0.66 | 0.54 |
| 36 | 111217 | 4.49 | 4.08 | 0.54 | 0.47 |
| 37 | 113258 | 2.14 | 1.94 | 0.61 | 0.53 |
| 38 | 104811 | 54.78 | 50.70 | 0.70 | 0.67 |
| 39 | 104426 | 32.35 | 29.23 | 0.87 | 0.78 |
| 40 | 106008 | 3.30 | 2.84 | 0.47 | 0.39 |
| 41 | 111245 | 1.31 | 1.18 | 0.68 | 0.62 |
| 42 | 108612 | 2.76 | 2.28 | 0.96 | 0.85 |
| 43 | 110863 | 3.86 | 3.61 | 0.79 | 0.71 |
| 44 | 105502 | 43.26 | 39.52 | 0.81 | 0.76 |
| 45 | 108806 | 6.00 | 5.40 | 0.59 | 0.50 |
| 46 | 106690 | 1.33 | 1.12 | 0.50 | 0.45 |
| 47 | 113164 | 6.29 | 5.00 | 0.53 | 0.47 |
| 48 | 109221 | 0.61 | 0.53 | 0.45 | 0.38 |
| 49 | 104394 | 50.92 | 47.65 | 5.44 | 4.38 |
| 50 | 113497 | 5.46 | 4.23 | 4.71 | 3.62 |
| 51 | 113494 | 2.40 | 2.18 | 1.50 | 1.25 |
| 52 | 109245 | 5.65 | 4.85 | 1.94 | 1.55 |
| 53 | 111136 | 6.07 | 5.24 | 2.90 | 2.38 |
| 54 | 108609 | 15.15 | 12.93 | 0.99 | 0.91 |
| 55 | 107746 | 3.84 | 3.39 | 0.82 | 0.77 |
| 56 | 111966 | 1.20 | 1.15 | 0.54 | 0.50 |
| 57 | 113515 | 2.98 | 2.64 | 0.46 | 0.40 |
| 58 | 107036 | 5.57 | 5.15 | 0.51 | 0.46 |
| 59 | 110810 | 5.30 | 4.67 | 0.55 | 0.49 |
| 60 | 113744 | 1.26 | 1.33 | 0.37 | 0.33 |
| 61 | 114270 | 15.91 | 13.81 | 11.57 | 9.43 |
| 62 | 113456 | 2.51 | 2.46 | 1.28 | 1.08 |
| 63 | 114683 | 0.63 | 0.60 | 1.25 | 1.00 |
| 64 | 106167 | 35.53 | 31.19 | 4.22 | 3.46 |
| 65 | 110906 | 1.64 | 1.48 | 1.13 | 0.93 |
| 66 | 104431 | 11.95 | 10.32 | 0.67 | 0.56 |
| 67 | 104513 | 2.38 | 2.36 | 0.68 | 0.60 |
| 68 | 99997 | 1.31 | 1.28 | 0.34 | 0.28 |
| 69 | 105926 | 2.29 | 2.07 | 0.83 | 0.73 |
| 70 | 108176 | 0.99 | 0.96 | 0.54 | 0.50 |
| 71 | 110472 | 0.93 | 0.84 | 0.51 | 0.47 |
| 72 | 110095 | 1.26 | 1.25 | 0.30 | 0.25 |
| 73 | 107159 | 11.86 | 10.76 | 0.59 | 0.49 |
| 74 | 108069 | 4.04 | 4.63 | 0.71 | 0.63 |
| 75 | 113458 | 3.27 | 3.08 | 0.60 | 0.54 |
| 76 | 106118 | 7.85 | 8.18 | 1.11 | 0.99 |
| 77 | 113885 | 1.90 | 1.78 | 0.50 | 0.42 |
| 78 | 114456 | 1.45 | 1.62 | 0.52 | 0.50 |
| 79 | 110517 | 8.91 | 8.46 | 0.73 | 0.62 |
| 80 | 110297 | 1.47 | 1.29 | 0.47 | 0.38 |
| 81 | 110339 | 0.76 | 0.71 | 0.59 | 0.52 |
| 82 | 114784 | 0.53 | 0.49 | 4.65 | 3.76 |
| 83 | 113878 | 0.53 | 0.41 | 3.39 | 2.72 |
| 84 | 114085 | 0.31 | 0.31 | 0.62 | 0.49 |
| 85 | 107290 | 1.53 | 1.51 | 0.50 | 0.43 |

| District | Persons | %Black | %Black VAP | % Hisp | % Hisp VAP |
|---|---|---|---|---|---|
| 86 | 114875 | 0.75 | 0.71 | 1.70 | 1.42 |
| 87 | 111458 | 3.29 | 3.81 | 0.55 | 0.52 |
| 88 | 112813 | 1.53 | 1.50 | 0.32 | 0.29 |
| 89 | 111876 | 2.43 | 2.10 | 4.53 | 3.68 |
| 90 | 107033 | 1.21 | 1.04 | 0.70 | 0.58 |
| 91 | 111012 | 4.30 | 4.92 | 0.44 | 0.43 |
| 92 | 112148 | 3.01 | 3.25 | 0.29 | 0.25 |
| 93 | 107335 | 0.90 | 0.81 | 0.73 | 0.56 |
| 94 | 114183 | 1.67 | 1.66 | 0.33 | 0.28 |
| 95 | 111796 | 0.88 | 0.90 | 0.31 | 0.25 |
| 96 | 114762 | 4.01 | 3.64 | 0.34 | 0.29 |
| 97 | 110909 | 0.96 | 0.91 | 0.30 | 0.24 |
| 98 | 107939 | 4.66 | 4.26 | 0.45 | 0.43 |
| 99 | 113348 | 1.21 | 1.14 | 0.26 | 0.23 |
| Averages | 109516 | 10.92 | 10.07 | 1.27 | 1.08 |

District Report for Plan 'planrepo' Senate
Wed Dec 4 11:08:28 1991

Target Population = 0

| District | Persons | %Black | %Black VAP | % Hisp | % Hisp VAP |
|---|---|---|---|---|---|
| 01 | 343538 | 0.60 | 0.54 | 3.25 | 2.62 |
| 02 | 337899 | 3.15 | 2.82 | 2.31 | 1.90 |
| 03 | 324694 | 7.10 | 6.69 | 0.97 | 0.89 |
| 04 | 331592 | 4.01 | 3.64 | 0.47 | 0.42 |
| 05 | 320101 | 29.83 | 27.72 | 0.79 | 0.72 |
| 06 | 325866 | 2.44 | 2.07 | 0.71 | 0.62 |
| 07 | 338385 | 2.91 | 2.86 | 0.54 | 0.47 |
| 08 | 326174 | 6.45 | 5.83 | 0.52 | 0.45 |
| 09 | 315577 | 48.39 | 43.74 | 0.70 | 0.68 |
| 10 | 321346 | 7.91 | 7.85 | 0.80 | 0.70 |
| 11 | 327138 | 20.03 | 17.57 | 4.02 | 3.11 |
| 12 | 331131 | 4.32 | 3.97 | 0.75 | 0.64 |
| 13 | 342410 | 6.35 | 5.63 | 4.70 | 3.84 |
| 14 | 333381 | 1.24 | 1.20 | 0.38 | 0.33 |
| 15 | 325017 | 36.85 | 33.08 | 0.97 | 0.95 |
| 16 | 328651 | 3.88 | 3.70 | 0.95 | 0.90 |
| 17 | 337343 | 2.98 | 3.27 | 0.35 | 0.32 |
| 18 | 313924 | 2.12 | 1.91 | 0.96 | 0.79 |
| 19 | 328150 | 3.79 | 3.57 | 0.64 | 0.52 |
| 20 | 339907 | 2.05 | 1.91 | 0.30 | 0.26 |
| 21 | 319058 | 65.07 | 60.99 | 1.53 | 1.38 |
| 22 | 321495 | 1.86 | 1.83 | 0.56 | 0.49 |
| 23 | 343989 | 3.41 | 2.80 | 6.01 | 4.77 |
| 24 | 328736 | 0.73 | 0.66 | 0.88 | 0.77 |
| 25 | 322655 | 38.70 | 36.05 | 0.73 | 0.66 |
| 26 | 330368 | 2.32 | 2.33 | 1.95 | 1.60 |
| 27 | 328661 | 4.59 | 3.89 | 0.54 | 0.47 |
| 28 | 328182 | 15.24 | 13.73 | 0.62 | 0.56 |
| 29 | 328322 | 6.68 | 5.80 | 0.78 | 0.72 |
| 30 | 327125 | 2.29 | 2.14 | 0.38 | 0.32 |
| 31 | 331793 | 1.50 | 1.58 | 0.50 | 0.45 |
| 32 | 308942 | 5.27 | 4.73 | 0.57 | 0.49 |
| 33 | 330589 | 12.98 | 11.26 | 1.89 | 1.55 |
| Averages | 328550 | 10.82 | 9.92 | 1.27 | 1.07 |

House to Senate Assignments

| Senate | House |
|---|---|
| 01: | 82, 83, 86 |
| 02: | 04, 51, 53 |
| 03: | 24, 25, 26 |
| 04: | 58, 59, 60 |
| 05: | 38, 39, 43 |
| 06: | 40, 41, 42 |

| Senate | House |
|--------|-------|
| 07: | 02, 36, 37 |
| 08: | 33, 34, 35 |
| 09: | 30, 31, 32 |
| 10: | 73, 74, 76 |
| 11: | 49, 50, 52 |
| 12: | 01, 84, 85 |
| 13: | 61, 62, 63 |
| 14: | 71, 72, 88 |
| 15: | 21, 22, 23 |
| 16: | 27, 28, 29 |
| 17: | 91, 92, 94 |
| 18: | 05, 69, 70 |
| 19: | 79, 80, 93 |
| 20: | 95, 96, 99 |
| 21: | 08, 09, 10 |
| 22: | 07, 15, 81 |
| 23: | 13, 17, 19 |
| 24: | 16, 18, 20 |
| 25: | 11, 12, 14 |
| 26: | 87, 89, 90 |
| 27: | ·45, 46, 47 |
| 28: | 44, 48, 75 |
| 29: | 54, 55, 56 |
| 30: | 03, 97, 98 |
| 31: | 06, 77, 78 |
| 32: | 66, 67, 68 |
| 33: | 57, 64, 65 |

## APPENDIX K

District Report for Plan 'demo0930' House
Wed Dec 4 11:11:19 1991

Target Population = 0

| District | Persons | %Black | %Black V | % Hisp | % Hisp VA |
|----------|---------|--------|----------|--------|-----------|
| 01 | 109755 | 11.22 | 10.07 | 1.13 | 1.00 |
| 02 | 108275 | 1.30 | 1.23 | 0.37 | 0.30 |
| 03 | 113908 | 2.12 | 2.56 | 0.46 | 0.42 |
| 04 | 113269 | 1.03 | 1.10 | 2.54 | 2.07 |
| 05 | 103451 | 1.11 | 1.30 | 0.47 | 0.41 |
| 06 | 113673 | 0.47 | 0.44 | 0.96 | 0.82 |
| 07 | 107260 | 2.62 | 2.19 | 1.42 | 1.20 |
| 08 | 114135 | 1.23 | 1.16 | 1.74 | 1.46 |
| 09 | 108063 | 6.05 | 5.14 | 1.86 | 1.57 |
| 10 | 109506 | 0.66 | 0.49 | 0.86 | 0.75 |
| 11 | 105670 | 8.54 | 7.32 | 15.82 | 13.22 |
| 12 | 104891 | 70.81 | 67.08 | 2.36 | 2.13 |
| 13 | 104758 | 63.86 | 60.18 | 0.82 | 0.79 |
| 14 | 105877 | 68.20 | 63.71 | 0.75 | 0.75 |
| 15 | 112720 | 27.89 | 26.46 | 0.91 | 0.81 |
| 16 | 106269 | 69.17 | 66.67 | 0.57 | 0.52 |
| 17 | 112526 | 3.12 | 2.97 | 0.62 | 0.59 |
| 18 | 106785 | 6.87 | 6.03 | 0.69 | 0.64 |
| 19 | 104912 | 50.80 | 46.40 | 1.02 | 0.95 |
| 20 | 111747 | 12.45 | 10.88 | 1.28 | 1.25 |
| 21 | 105539 | 53.85 | 50.60 | 0.89 | 0.84 |
| 22 | 107890 | 7.04 | 6.61 | 0.87 | 0.82 |
| 23 | 107563 | 4.79 | 4.15 | 0.73 | 0.66 |
| 24 | 114746 | 5.08 | 4.78 | 0.90 | 0.80 |
| 25 | 114655 | 1.62 | 1.49 | 0.99 | 0.93 |
| 26 | 109984 | 5.99 | 5.23 | 1.11 | 1.02 |
| 27 | 114704 | 3.46 | 3.11 | 0.65 | 0.57 |
| 28 | 104246 | 61.26 | 57.91 | 0.63 | 0.59 |
| 29 | 109991 | 2.53 | 2.30 | 0.59 | 0.52 |
| 30 | 112793 | 3.96 | 3.26 | 0.41 | 0.35 |

| District | Persons | %Black | %Black V | % Hisp | % Hisp VA |
|---|---|---|---|---|---|
| 31 | 105394 | 4.39 | 3.55 | 0.51 | 0.48 |
| 32 | 107674 | 18.46 | 16.71 | 0.58 | 0.51 |
| 33 | 105690 | 55.49 | 47.10 | 0.78 | 0.81 |
| 34 | 105731 | 21.67 | 19.55 | 0.67 | 0.58 |
| 35 | 106995 | 4.23 | 3.62 | 0.89 | 0.79 |
| 36 | 104213 | 47.63 | 45.26 | 0.48 | 0.42 |
| 37 | 104544 | 40.79 | 36.20 | 0.88 | 0.81 |
| 38 | 114880 | 1.09 | 0.99 | 0.82 | 0.75 |
| 39 | 114603 | 3.21 | 2.71 | 1.00 | 0.89 |
| 40 | 111432 | 2.54 | 2.24 | 0.56 | 0.49 |
| 41 | 113674 | 4.25 | 3.81 | 0.54 | 0.47 |
| 42 | 104890 | 47.20 | 43.09 | 0.81 | 0.76 |
| 43 | 110906 | 2.88 | 2.54 | 0.52 | 0.45 |
| 44 | 114864 | 3.34 | 3.02 | 1.60 | 1.32 |
| 45 | 104278 | 50.12 | 44.98 | 2.77 | 2.32 |
| 46 | 111845 | 5.73 | 4.70 | 2.51 | 1.98 |
| 47 | 109644 | 5.22 | 4.16 | 6.67 | 5.05 |
| 48 | 114941 | 3.52 | 3.08 | 0.63 | 0.56 |
| 49 | 111681 | 3.84 | 3.43 | 0.72 | 0.68 |
| 50 | 113964 | 14.49 | 12.49 | 0.97 | 0.90 |
| 51 | 107036 | 5.57 | 5.15 | 0.51 | 0.46 |
| 52 | 111635 | 5.27 | 4.63 | 0.55 | 0.49 |
| 53 | 104733 | 9.77 | 8.31 | 12.58 | 10.28 |
| 54 | 105133 | 7.69 | 6.73 | 1.39 | 1.17 |
| 55 | 106167 | 35.53 | 31.19 | 4.22 | 3.46 |
| 56 | 114523 | 1.60 | 1.44 | 1.11 | 0.93 |
| 57 | 114568 | 2.31 | 2.27 | 0.71 | 0.62 |
| 58 | 108645 | 1.01 | 0.97 | 0.53 | 0.49 |
| 59 | 106854 | 2.27 | 2.07 | 0.84 | 0.73 |
| 60 | 105632 | 1.01 | 0.94 | 0.48 | 0.44 |
| 61 | 104588 | 11.96 | 10.92 | 0.74 | 0.60 |
| 62 | 106173 | 3.44 | 3.23 | 0.62 | 0.55 |
| 63 | 111280 | 8.33 | 8.66 | 1.11 | 1.00 |
| 64 | 114756 | 1.90 | 1.78 | 0.50 | 0.42 |
| 65 | 108616 | 8.95 | 8.47 | 0.77 | 0.65 |
| 66 | 112987 | 0.74 | 0.69 | 0.60 | 0.52 |
| 67 | 109949 | 2.30 | 2.06 | 0.73 | 0.66 |
| 68 | 113700 | 1.63 | 1.48 | 0.35 | 0.29 |
| 69 | 110497 | 0.98 | 0.81 | 0.46 | 0.39 |
| 70 | 105119 | 5.85 | 5.01 | 3.54 | 2.92 |
| 71 | 111087 | 0.74 | 0.71 | 0.31 | 0.26 |
| 72 | 112919 | 1.27 | 1.33 | 0.36 | 0.33 |
| 73 | 108078 | 3.32 | 3.40 | 1.04 | 0.91 |
| 74 | 110771 | 10.95 | 9.47 | 0.59 | 0.51 |
| 75 | 114838 | 1.27 | 1.22 | 0.38 | 0.32 |
| 76 | 104891 | 0.64 | 0.65 | 0.33 | 0.28 |
| 77 | 104429 | 1.78 | 1.76 | 0.55 | 0.50 |
| 78 | 112438 | 2.34 | 2.47 | 0.46 | 0.40 |
| 79 | 112500 | 0.97 | 0.89 | 0.38 | 0.30 |
| 80 | 110827 | 1.42 | 1.30 | 0.41 | 0.34 |
| 81 | 114804 | 0.53 | 0.49 | 4.65 | 3.76 |
| 82 | 113878 | 0.53 | 0.41 | 3.39 | 2.72 |
| 83 | 111142 | 0.76 | 0.69 | 0.58 | 0.47 |
| 84 | 106587 | 0.76 | 0.72 | 0.53 | 0.43 |
| 85 | 111842 | 0.78 | 0.74 | 1.66 | 1.39 |
| 86 | 110792 | 3.69 | 4.24 | 0.38 | 0.38 |
| 87 | 108293 | 2.48 | 2.14 | 4.14 | 3.31 |
| 88 | 114276 | 2.44 | 2.62 | 0.65 | 0.57 |
| 89 | 113349 | 6.60 | 7.91 | 0.58 | 0.62 |
| 90 | 104575 | 2.66 | 2.98 | 0.32 | 0.28 |
| 91 | 104110 | 0.82 | 0.75 | 1.20 | 0.98 |
| 92 | 107880 | 3.19 | 2.96 | 0.31 | 0.27 |
| 93 | 107397 | 1.68 | 1.61 | 0.26 | 0.23 |
| 94 | 113490 | 2.40 | 2.45 | 0.58 | 0.54 |
| 95 | 107300 | 1.01 | 1.00 | 0.33 | 0.27 |
| 96 | 107724 | 1.54 | 1.48 | 0.32 | 0.26 |
| 97 | 112699 | 2.94 | 2.67 | 1.40 | 1.08 |
| 98 | 106819 | 4.33 | 3.98 | 0.49 | 0.46 |

| District | Persons | %Black | %Black V | % Hisp | % Hisp VA |
|---|---|---|---|---|---|
| 99 | 112076 | 1.52 | 1.40 | 0.25 | 0.22 |
| Averages | 109554 | 10.94 | 10.07 | 1.30 | 1.10 |

District Report for Plan 'demo0930' Senate
Wed Dec 4 11:13:39 1991

Target Population = 0

| District | Persons | %Black | %Black V | % Hisp | % Hisp VA |
|---|---|---|---|---|---|
| 01 | 340524 | 0.61 | 0.55 | 3.25 | 2.62 |
| 02 | 333252 | 3.35 | 2.98 | 2.53 | 2.08 |
| 03 | 339350 | 3.01 | 2.77 | 0.87 | 0.80 |
| 04 | 331592 | 4.01 | 3.64 | 0.47 | 0.42 |
| 05 | 315753 | 30.66 | 28.21 | 0.75 | 0.68 |
| 06 | 343183 | 1.98 | 1.72 | 0.73 | 0.65 |
| 07 | 338604 | 2.70 | 2.66 | 0.57 | 0.50 |
| 08 | 325863 | 8.89 | 7.79 | 0.50 | 0.44 |
| 09 | 315668 | 46.07 | 41.57 | 0.69 | 0.66 |
| 10 | 320297 | 7.38 | 7.15 | 0.81 | 0.71 |
| 11 | 325768 | 19.77 | 17.43 | 3.99 | 3.11 |
| 12 | 327486 | 4.26 | 3.89 | 0.75 | 0.64 |
| 13 | 317945 | 6.89 | 6.10 | 4.96 | 4.05 |
| 14 | 321316 | 1.81 | 2.01 | 0.40 | 0.37 |
| 15 | 322199 | 38.50 | 34.50 | 1.07 | 1.03 |
| 16 | 325437 | 5.94 | 5.33 | 0.91 | 0.84 |
| 17 | 325322 | 3.71 | 4.29 | 0.39 | 0.38 |
| 18 | 328198 | 2.08 | 1.89 | 0.93 | 0.77 |
| 19 | 328417 | 3.62 | 3.48 | 0.49 | 0.41 |
| 20 | 329096 | 2.38 | 2.30 | 0.41 | 0.37 |
| 21 | 315527 | 67.62 | 63.61 | 1.31 | 1.21 |
| 22 | 334902 | 0.96 | 0.89 | 0.44 | 0.38 |
| 23 | 327869 | 5.17 | 4.35 | 6.31 | 5.01 |
| 24 | 330440 | 1.23 | 1.02 | 1.07 | 0.92 |
| 25 | 331516 | 32.72 | 30.95 | 0.71 | 0.64 |
| 26 | 326680 | 1.94 | 1.87 | 1.98 | 1.61 |
| 27 | 327229 | 16.97 | 15.10 | 0.63 | 0.56 |
| 28 | 330345 | 2.90 | 2.63 | 0.54 | 0.47 |
| 29 | 340587 | 7.30 | 6.32 | 0.77 | 0.71 |
| 30 | 327171 | 2.36 | 2.19 | 0.37 | 0.33 |
| 31 | 330645 | 1.80 | 1.86 | 0.48 | 0.41 |
| 32 | 336193 | 3.40 | 3.20 | 0.59 | 0.53 |
| 33 | 331462 | 15.59 | 13.46 | 1.93 | 1.59 |
| Averages | 328662 | 10.84 | 9.93 | 1.29 | 1.09 |

House to Senate Assignments

| Senate | House |
|---|---|
| 01: | 81, 82, 85 |
| 02: | 04, 44, 70 |
| 03: | 24, 25, 67 |
| 04: | 51, 52, 72 |
| 05: | 35, 36, 37 |
| 06: | 38, 39, 68 |
| 07: | 03, 27, 29 |
| 08: | 30, 31, 32 |
| 09: | 28, 33, 34 |
| 10: | 61, 63, 77 |
| 11: | 45, 46, 47 |
| 12: | 01, 83, 84 |
| 13: | 53, 54, 73 |
| 14: | 60, 76, 86 |
| 15: | 19, 20, 21 |
| 16: | 22, 23, 26 |
| 17: | 89, 90, 93 |
| 18: | 58, 59, 97 |
| 19: | 65, 79, 95 |

| Senate | House |
|--------|-------|
| 20: | 92, 94, 96 |
| 21: | 12, 13, 14 |
| 22: | 66, 71, 80 |
| 23: | 08, 09, 11 |
| 24: | 06, 07, 10 |
| 25: | 15, 16, 17 |
| 26: | 87, 88, 91 |
| 27: | 40, 42, 43 |
| 28: | 41, 62, 69 |
| 29: | 48, 49, 50 |
| 30: | 02, 98, 99 |
| 31: | 05, 64, 78 |
| 32: | 18, 57, 75 |
| 33: | 55, 56, 74 |

## APPENDIX L
### 1981 SENATE DISTRICTS WITH 1990 CENSUS POPULATION

| DISTRICT | POPULATION | PERCENT BLACK | PERCENT BLACK VAP | PERCENT HISPANIC | PERCENT HISPANIC VAP |
|----------|-----------|---------------|-------------------|------------------|----------------------|
| 01 | 343558 | 0.60 | 0.54 | 3.25 | 2.62 |
| 02 | 336877 | 3.19 | 2.86 | 2.33 | 1.91 |
| 03 | 422255 | 2.84 | 2.74 | 0.76 | 0.69 |
| 04 | 372743 | 3.61 | 3.29 | 0.50 | 0.44 |
| 05 | 341144 | 14.25 | 12.99 | 0.69 | 0.61 |
| 06 | 338315 | 16.25 | 14.75 | 0.77 | 0.69 |
| 07 | 362720 | 5.51 | 5.15 | 0.59 | 0.52 |
| 08 | 330392 | 9.73 | 7.96 | 0.51 | 0.45 |
| 09 | 300184 | 43.79 | 39.56 | 0.65 | 0.63 |
| 10 | 334001 | 7.18 | 6.95 | 0.75 | 0.66 |
| 11 | 319262 | 20.31 | 17.96 | 4.08 | 3.18 |
| 12 | 335867 | 5.22 | 5.05 | 0.73 | 0.64 |
| 13 | 307425 | 7.10 | 6.28 | 5.07 | 4.13 |
| 14 | 350828 | 1.49 | 1.56 | 0.37 | 0.33 |
| 15 | 320670 | 29.35 | 25.76 | 1.03 | 0.97 |
| 16 | 345169 | 14.30 | 13.02 | 0.96 | 0.92 |
| 17 | 334237 | 3.59 | 4.05 | 0.47 | 0.47 |
| 18 | 315320 | 2.11 | 1.91 | 0.95 | 0.79 |
| 19 | 322578 | 3.84 | 3.63 | 0.53 | 0.44 |
| 20 | 312932 | 1.30 | 1.25 | 0.30 | 0.25 |
| 21 | 275243 | 65.85 | 61.86 | 1.63 | 1.47 |
| 22 | 334335 | 10.20 | 9.65 | 0.66 | 0.58 |
| 23 | 297346 | 3.70 | 3.01 | 6.70 | 5.33 |
| 24 | 329664 | 1.15 | 0.97 | 1.03 | 0.89 |
| 25 | 297906 | 40.58 | 37.57 | 0.72 | 0.67 |
| 26 | 312334 | 2.02 | 1.94 | 2.28 | 1.86 |
| 27 | 327310 | 15.55 | 13.99 | 0.64 | 0.58 |
| 28 | 330265 | 4.30 | 3.60 | 0.52 | 0.45 |
| 29 | 328322 | 6.68 | 5.80 | 0.78 | 0.72 |
| 30 | 315270 | 2.24 | 2.09 | 0.38 | 0.33 |
| 31 | 339632 | 2.01 | 1.95 | 0.42 | 0.36 |
| 32 | 308942 | 5.27 | 4.73 | 0.57 | 0.49 |
| 33 | 304069 | 14.07 | 12.17 | 2.02 | 1.65 |

\* \* \* Total \* \* \*

10847115

## APPENDIX M
### District Report for Plan 'planrepo' Senate
### Mon Dec 2 10:48:38 1991

Target Population = 0

| District | %Black | %Black VAP | % Hisp | % Hisp VAP |
|----------|--------|------------|--------|------------|
| 01 | 0.60 | 0.54 | 3.25 | 2.62 |
| 02 | 3.15 | 2.82 | 2.31 | 1.90 |

| District | %Black | %Black VAP | % Hisp | % Hisp VAP |
|---|---|---|---|---|
| 03 | 7.10 | 6.69 | 0.97 | 0.89 |
| 04 | 4.01 | 3.64 | 0.47 | 0.42 |
| 05 | 29.83 | 27.72 | 0.79 | 0.72 |
| 06 | 2.44 | 2.07 | 0.71 | 0.62 |
| 07 | 2.91 | 2.86 | 0.54 | 0.47 |
| 08 | 6.45 | 5.83 | 0.52 | 0.45 |
| 09 | 48.39 | 43.74 | 0.70 | 0.68 |
| 10 | 7.91 | 7.85 | 0.80 | 0.70 |
| 11 | 20.03 | 17.57 | 4.02 | 3.11 |
| 12 | 4.32 | 3.97 | 0.75 | 0.64 |
| 13 | 6.35 | 5.63 | 4.70 | 3.84 |
| 14 | 1.24 | 1.20 | 0.38 | 0.33 |
| 15 | 36.85 | 33.08 | 0.97 | 0.95 |
| 16 | 3.88 | 3.70 | 0.95 | 0.90 |
| 17 | 2.98 | 3.27 | 0.35 | 0.32 |
| 18 | 2.12 | 1.91 | 0.96 | 0.79 |
| 19 | 3.79 | 3.57 | 0.64 | 0.52 |
| 20 | 2.05 | 1.91 | 0.30 | 0.26 |
| 21 | 65.07 | 60.99 | 1.53 | 1.38 |
| 22 | 1.86 | 1.83 | 0.56 | 0.49 |
| 23 | 3.41 | 2.80 | 6.01 | 4.77 |
| 24 | 0.73 | 0.66 | 0.88 | 0.77 |
| 25 | 38.70 | 36.05 | 0.73 | 0.66 |
| 26 | 2.32 | 2.33 | 1.95 | 1.60 |
| 27 | 4.59 | 3.89 | 0.54 | 0.47 |
| 28 | 15.24 | 13.73 | 0.62 | 0.56 |
| 29 | 6.68 | 5.80 | 0.78 | 0.72 |
| 30 | 2.29 | 2.14 | 0.38 | 0.32 |
| 31 | 1.50 | 1.58 | 0.50 | 0.45 |
| 32 | 5.27 | 4.73 | 0.57 | 0.49 |
| 33 | 12.98 | 11.26 | 1.89 | 1.55 |
| Averages | 10.82 | 9.92 | 1.27 | 1.07 |

House to Senate Assignments

| Senate | House |
|---|---|
| 01: | 82, 83, 86 |
| 02: | 04, 51, 53 |
| 03: | 24, 25, 26 |
| 04: | 58, 59, 60 |
| 05: | 38, 39, 43 |
| 06: | 40, 41, 42 |
| 07: | 02, 36, 37 |
| 08: | 33, 34, 35 |
| 09: | 30, 31, 32 |
| 10: | 73, 74, 76 |
| 11: | 49, 50, 52 |
| 12: | 01, 84, 85 |
| 13: | 61, 62, 63 |
| 14: | 71, 72, 88 |
| 15: | 21, 22, 23 |
| 16: | 27, 28, 29 |
| 17: | 91, 92, 94 |
| 18: | 05, 69, 70 |
| 19: | 79, 80, 93 |
| 20: | 95, 96, 99 |
| 21: | 08, 09, 10 |
| 22: | 07, 15, 81 |
| 23: | 13, 17, 19 |
| 24: | 16, 18, 20 |
| 25: | 11, 12, 14 |
| 26: | 87, 89, 90 |
| 27: | 45, 46, 47 |
| 28: | 44, 48, 75 |
| 29: | 54, 55, 56 |
| 30: | 03, 97, 98 |

| Senate | House |
|--------|-------|
| 31: | 06, 77, 78 |
| 32: | 66, 67, 68 |
| 33: | 57, 64, 65 |

## APPENDIX N
### District Report for Plan 'demo0930' Senate
### Mon Dec 2 10:40:02 1991

Target Population = 0

| District | %Black | %Black V | % Hisp | % Hisp VA |
|----------|--------|----------|--------|-----------|
| 01 | 0.61 | 0.55 | 3.25 | 2.62 |
| 02 | 3.35 | 2.98 | 2.53 | 2.08 |
| 03 | 3.01 | 2.77 | 0.87 | 0.80 |
| 04 | 4.01 | 3.64 | 0.47 | 0.42 |
| 05 | 30.66 | 28.21 | 0.75 | 0.68 |
| 06 | 1.98 | 1.72 | 0.73 | 0.65 |
| 07 | 2.70 | 2.66 | 0.57 | 0.50 |
| 08 | 8.89 | 7.79 | 0.50 | 0.44 |
| 09 | 46.07 | 41.57 | 0.69 | 0.66 |
| 10 | 7.38 | 7.15 | 0.81 | 0.71 |
| 11 | 19.77 | 17.43 | 3.99 | 3.11 |
| 12 | 4.26 | 3.89 | 0.75 | 0.64 |
| 13 | 6.89 | 6.10 | 4.96 | 4.05 |
| 14 | 1.81 | 2.01 | 0.40 | 0.37 |
| 15 | 38.50 | 34.50 | 1.07 | 1.03 |
| 16 | 5.94 | 5.33 | 0.91 | 0.84 |
| 17 | 3.71 | 4.29 | 0.39 | 0.38 |
| 18 | 2.08 | 1.89 | 0.93 | 0.77 |
| 19 | 3.62 | 3.48 | 0.49 | 0.41 |
| 20 | 2.38 | 2.30 | 0.41 | 0.37 |
| 21 | 67.62 | 63.61 | 1.31 | 1.21 |
| 22 | 0.96 | 0.89 | 0.44 | 0.38 |
| 23 | 5.17 | 4.35 | 6.31 | 5.01 |
| 24 | 1.23 | 1.02 | 1.07 | 0.92 |
| 25 | 32.72 | 30.95 | 0.71 | 0.64 |
| 26 | 1.94 | 1.87 | 1.98 | 1.61 |
| 27 | 16.97 | 15.10 | 0.63 | 0.56 |
| 28 | 2.90 | 2.63 | 0.54 | 0.47 |
| 29 | 7.30 | 6.32 | 0.77 | 0.71 |
| 30 | 2.36 | 2.19 | 0.37 | 0.33 |
| 31 | 1.80 | 1.86 | 0.48 | 0.41 |
| 32 | 3.40 | 3.20 | 0.59 | 0.53 |
| 33 | 15.59 | 13.46 | 1.93 | 1.59 |
| Averages | 10.84 | 9.93 | 1.29 | 1.09 |

House to Senate Assignments

| Senate | House |
|--------|-------|
| 01: | 81, 82, 85 |
| 02: | 04, 44, 70 |
| 03: | 24, 25, 67 |
| 04: | 51, 52, 72 |
| 05: | 35, 36, 37 |
| 06: | 38, 39, 68 |
| 07: | 03, 27, 29 |
| 08: | 30, 31, 32 |
| 09: | 28, 33, 34 |
| 10: | 61, 63, 77 |
| 11: | 45, 46, 47 |
| 12: | 01, 83, 84 |
| 13: | 53, 54, 73 |
| 14: | 60, 76, 86 |
| 15: | 19, 20, 21 |
| 16: | 22, 23, 26 |
| 17: | 89, 90, 93 |
| 18: | 58, 59, 97 |
| 19: | 65, 79, 95 |

| Senate | House |
|---|---|
| 20: | 92, 94, 96 |
| 21: | 12, 13, 14 |
| 22: | 66, 71, 80 |
| 23: | 08, 09, 11 |
| 24: | 06, 07, 10 |
| 25: | 15, 16, 17 |
| 26: | 87, 88, 91 |
| 27: | 40, 42, 43 |
| 28: | 41, 62, 69 |
| 29: | 48, 49, 50 |
| 30: | 02, 98, 99 |
| 31: | 05, 64, 78 |
| 32: | 18, 57, 75 |
| 33: | 55, 56, 74 |

## APPENDIX O

### COMPARISON OF HOUSE DISTRICTS WITH BLACK VAP OVER 10% IN 1991 MAJORITY AND MINORITY APPORTIONMENT PLANS

| House District | 1991 Majority Plan | House District | 1991 Minority Plan |
|---|---|---|---|
| 12 | 65.13 | 12 | 67.08 |
| 10 | 63.42 | 16 | 66.67 |
| 8 | 61.41 | 14 | 63.71 |
| 9 | 58.36 | 13 | 60.18 |
| 30 | 56.83 | 28 | 57.91 |
| 31 | 52.60 | 21 | 50.60 |
| 38 | 50.70 | 33 | 47.10 |
| 21 | 50.30 | 19 | 46.40 |
| 49 | 47.65 | 36 | 45.26 |
| 22 | 44.31 | 45 | 44.98 |
| 11 | 40.61 | 42 | 43.09 |
| 44 | 39.52 | 37 | 36.20 |
| 64 | 31.19 | 55 | 31.19 |
| 39 | 29.23 | 15 | 26.46 |
| 32 | 21.58 | 34 | 19.55 |
| 61 | 13.81 | 32 | 16.71 |
| 54 | 12.93 | 50 | 12.49 |
| 73 | 10.76 | 61 | 10.92 |
| 66 | 10.32 | 20 | 10.88 |
| 1 | 10.07 | 1 | 10.07 |
| TOTAL | 20 | | 20 |

## APPENDIX P

### PERCENTAGE POPULATION OF HOUSE DISTRICTS WITH MINORITY REPRESENTATIVES

| Current State Representative | 1981 House District Number | 1981 Percent Black Population | 1991 House District Number | 1991 Percent Black | Percentage Change |
|---|---|---|---|---|---|
| Troy James | 12 | 74.8% | 10 | 67.0% | − 7.8 |
| C.J. Prentiss | 14 | 90.1% | 8 | 65.6% | −24.5 |
| Vermel Whalen | 16 | 94.6% | 12 | 67.0% | −27.6 |
| William Mallory | 23 | 45.9% | 31 | 59.7% | + 13.8 |
| Helen Rankin | 25 | 53.2% | 30 | 60.9% | + 7.7 |
| Ray Miller | 29 | 38.5% | 21 | 55.7% | +17.2 |
| Otto Beatty | 31 | 46.8% | 22 | 48.0% | + 1.2 |
| Rhine McLin | 36 | 42.1% | 38 | 54.6% | +12.5 |
| Tom Roberts | 37 | 36.1% | 39 | 32.2% | − 3.9 |
| Vernon Sykes | 42 | 35.4% | 44 | 43.0% | + 7.6 |
| Casey Jones | 45 | 41.7% | 49 | 50.0% | + 8.3 |

## APPENDIX Q
## POLITICAL STRENGTH OF MINORITY
## INCUMBENTS—1991 APPORTIONMENT PLAN

| 1981 House District | Incumbent | Political Index | 1991 House District | Political Index | Result |
|---|---|---|---|---|---|
| 12 | Troy James | 80.15 | 10 | 79.04 | Strongly Democratic |
| 14 | C.J. Prentiss | 84.83 | 8 | 75.23 | Strongly Democratic |
| 16 | Vermel Whalen | 87.18 | 12 | 78.88 | Strongly Democratic |
| 23 | William Mallory | 65.74 | 31 | 69.28 | Strongly Democratic |
| 25 | Helen Rankin | 66.74 | 30 | 74.68 | Strongly Democratic |
| 29 | Ray Miller | 62.97 | 21 | 76.50 | Strongly Democratic |
| 31 | Otto Beatty | 66.33 | 22 | 69.35 | Strongly Democratic |
| 36 | Rhine McLin | 64.40 | 38 | 75.63 | Strongly Democratic |
| 37 | Tom Roberts | 62.52 | 39 | 64.40 | Strongly Democratic |
| 42 | Vernon Sykes | 58.64 | 44 | 72.21 | Strongly Democratic |
| 45 | Casey Jones | 64.99 | 49 | 77.64 | Strongly Democratic |

APPENDIX R

# The Black Elected Democrats of Ohio

37 West Broad Street, Suite 430 • Columbus, Ohio 43215 • Telephone 614 / 341-6912

Officers

President
WILLIAM L. MALLORY
State Representative
Cincinnati

1st Vice President
TOM ROBERTS
State Representative
Dayton

2nd Vice President
WILLIAM BOWEN
State Senator
Cincinnati

Secretary
CASEY JONES
State Representative
Toledo

Treasurer
BARBARA SYKES
Deputy Auditor
Summit County

Sergeant-at Arms
KATHRYN RUMPH-COLE
City Commissioner
Hamilton

Parliamentarian
JEFFREY JOHNSON, ESQ
Senator
Cleveland

OTTO BEATTY, JR.
State Representative
Columbus

TROY LEE JAMES
State Representative
Cleveland

RHINE McLIN
State Representative
Dayton

RAY MILLER
State Representative
Columbus

C.J. PRENTISS
State Representative
Cleveland

HELEN RANKIN
State Representative
Cincinnati

VERNON SYKES
State Representative
Akron

VERMEL WHALEN
State Representative
Cleveland

President Emeritus
C. McLIN, JR.
Fmr State Representative
Dayton

DANA MATTISON
Executive Director

BELINDA TAYLOR
Associate Director

October 1, 1991

Mr. James Tilling, Secretary
Ohio Reapportionment Board
Ohio Senate
Statehouse
Columbus, Ohio 43215

Dear Mr. Tilling:

This will serve as an official letter of support for the amendment offered by Dana Mattison for Cuyahoga County.

Sincerely,

REP WILLIAM L. MALLORY
President

DEFENDANT'S
EXHIBIT
24